DE VITO v. UNITED AIR LINES, Inc., et al.
Civ. No. 9555.

United States District Court
E. D. New York.
May 24, 1951.

Gair & Gair, New York City, for plaintiff.

Haight, Deming, Gardner, Poor & Havens, New York City, William J. Junkerman, David L. Corbin, and Douglas B. Bowring, all of New York City, of counsel, for defendant United Air Lines, Inc.

Mendes & Mount, New York City, for defendant Douglas Aircraft Co., Inc.

GALSTON, District Judge.

Following a verdict of $300,000 in favor of the plaintiff against both defendants, and a verdict in favor of Douglas on the cross-claim of United against Douglas, motions have been made in respect to the verdicts by both Douglas and United.

The Douglas Aircraft Company, Inc., throughout this opinion will be referred to as Douglas, and United Air Lines, Inc. will be referred to as United.

The motions of Douglas insofar as the plaintiff's claim is concerned, are for a directed verdict, and in the alternative, for a new trial.

The motions of United are to set aside the verdict for plaintiff against the defendant United, and the verdict in favor of Douglas on United's cross-claim.

These motions will be disposed of in this one opinion.

The plaintiff as widow and administratrix in this action, sought to recover damages for the death of her husband, Anthony DeVito, pursuant to a statute of Pennsylvania, which provides: "Whenever death shall be occasioned by unlawful violence or negligence, and no suit for damages be brought by the party injured during his or her lifetime the widow of any such deceased * * * may maintain an action for and recover damages for the death thus occasioned." April 15, 1851, P.L. 669, sec. 19, 12 P.S.Pa. § 1601.

On June 17, 1948 Anthony DeVito, resident of Brooklyn, New York, was a passenger on board a United DC-6 commercial air liner, designated NC 37506. On a scheduled daylight flight from Chicago to New York, under prevailing good weather conditions, the plane crashed into a hillside near Mt. Carmel, Pennsylvania. All thirty-nine passengers and four crew members were killed in the crash.

It is the claim of the plaintiff that the catastrophe resulted from the negligence of the defendants. United was the carrier and was in control of the operation of the plane. Douglas was the manufacturer of the plane.

The cross-claim of United against Douglas is on two counts: (1) an alleged breach of contract, and (2) a claim that if the jury found a verdict for plaintiff against United, then it should hold Douglas responsible for any act of negligence of United.

With these multiple claims, and a denial of all material allegations relating to negligence and to breach of contract, the parties determined on a course of examination before trial of many witnesses, and the taking of many depositions. And at the trial, the testimony of some forty-odd witnesses in addition was taken, and hundreds of exhibits offered; so that we have a record of over thirty-three hundred typewritten pages.

At the outset it may be said that it was difficult for the plaintiff, and for the defendant United, to explore the evidentiary grounds. Trial counsel for Douglas certainly did not facilitate them during the taking of the pre-trial depositions; and the trial itself was prolonged to a matter of seven weeks, due in marked degree to prolix examination and cross-examination by trial counsel for Douglas.

The plane which crashed was sold by Douglas to United on or about March 25, 1947, pursuant to the terms of a purchase agreement which had been entered into between the parties covering that plane and nineteen similar airplanes. United paid Douglas the purchase price, amounting in the aggregate to more than thirteen million dollars.

On November 11, 1947, all Douglas DC-6's which were then in operation, including NC 37506, were grounded because of fires of undetermined origin that had occurred on other DC-6's at Bryce Canyon, Utah, on October 24, 1947, and at Gallup, New Mexico, on November 11, 1947. Shortly thereafter, a Modification Board was set up, in November and early December 1947, for the purpose of considering recommendations concerning changes in design of the DC-6, in order to avoid a recurrence of the fires at Bryce Canyon and Gallup. Among those who participated in the work of the Modification Board were representatives of Douglas, Civil Aeronautics Board, Civil Aeronautics Administration, United Air Lines, American Air Lines, Pan American-Grace, and National Air Lines. The Board was presided over by Arthur Raymond, a vice-president of Douglas.

In a letter from Mr. F. W. Conant, a vice-president of Douglas, written November 28, 1947, to Mr. W. A. Patterson, president of United, it was stated that it was the desire of Douglas to make effective such changes as were determined by this board and approved by the Civil Aeronautics Administration. Then, following the meetings of the Modification Board in November and December 1947, Douglas conducted a number of flight tests, in January and February 1948. Douglas then determined the final configuration of the modified DC-6 planes to control or regulate the fire-fighting apparatus, and the ventilation of underfloor baggage compartments, in order, inter alia, to avoid hazardous concentration of carbon-dioxide gas from entering into the habitable compartments of the plane when carbon dioxide was discharged. Thereafter plans, blue-prints and special equipment required in making the changes were furnished by Douglas to United. The actual physical work in meeting the Douglas plans and specifications was performed by United, but at Douglas' expense. Personnel were sent by Douglas to United's repair station to provide technical advice and supervision, and to assist whenever necessary in the incorporation of the changes in the airplanes. During this period numerous "service bulletins" were furnished by Douglas to United, covering all phases of the modification program. Each of these bulletins covered one or more specific design changes, and explained the reason for the change. On the completion of the modification changes, airplane NC 37506 was authorized by the Civil Aeronautics Administration to resume operation, and accordingly was put back into service of United on June 3, 1948.

It may be well to note now that evidence introduced by Douglas, as well as by the plaintiff, and which was not disputed by United, disclosed that carbon dioxide had been discharged by the pilots of NC 37506 into the forward baggage compartment shortly before the fatal crash. This fact was one of the circumstances which would seem to have warranted the jury in inferring that concentrations of carbon dioxide entered the cockpit and rendered the pilot and co-pilot incapable of proper control of the plane.

In support of its motions, Douglas contends that it fully satisfied its duty to warn United of any danger in the operation of the airplane by including in the emergency procedure a warning contained in its operation and maintenance manuals that failure fully to open the emergency pressure relief valves would result in excessive amounts of carbon dioxide entering the cockpit.

█ The duty to instruct the users of its DC-6 as to inherent dangers and precau-

tions to meet them rested on Douglas. Douglas knew, and therefore should be charged with the knowledge, that during the flight tests conducted by Douglas in January and February 1948, the test pilots were adversely affected by carbon dioxide entering the cockpit, even when the manually operated cabin pressure relief valve was open, and even though the pilots were wearing oxygen masks of the re-breather type. This evidence weighs heavily against Douglas. Pilot Peyton, Douglas's chief test pilot, told Dr. C. S. White of the Lovelace Clinic that he was "almost completely out" in one of the test flights. Londelius, another test engineer of Douglas, who was present in the cockpit on Flight A–5, as well as on other flight tests, told Dr. White that Peyton, the pilot, "just sat there", and the pilot seemed to be excited and was staring straight ahead.

This condition was so serious that Douglas realized that it was faced with a new problem, a problem not theretofore encountered in the operation of DC–6 airplanes specifically, nor in commercial aviation generally. Mr. Raymond said: "I would say in the discussions of the Modification Board there was a general awareness of the fact that too high a concentration of $CO_2$ might be expected to cause a starvation of oxygen—in other words, a partial suffocation—but at that time all of the discussions before the Board indicated to me that the people present thought of $CO_2$ as a completely harmless material, except as it might starve out oxygen. After all, it is something that we breathe out every time we breathe."

Nevertheless, the results of the flight tests were regarded as so disturbing as to cause Douglas to retain the Lovelace Clinic Aero-Medical Specialists to conduct a survey. The report of Dr. White, the representative sent by Lovelace Clinic to the Douglas plant to conduct the investigation, was submitted to Douglas in February of 1948. As will presently appear, the jury could very well have reached the conclusion that the Mt. Carmel catastrophe stemmed from the "active" negligence of Douglas in respect to this report. The report raises a question whether the flight tests conducted by Douglas and which resulted in the final configuration as to emergency fire-fighting procedures, especially the procedure for ventilating the airplanes after the discharge of the carbon dioxide, adequately met the problem of hazard of carbon dioxide concentration. The report, among other matters, recited:

"3. Carbon Dioxide gas is toxic to humans because it produces anoxia, a gaseous acidosis of the blood and irritation of the eyes and respiratory passages. A relatively severe acidosis may produce rapid failure of the normal healthy heart.

"7. There is a need for more research on the toxic effects of inspiring $CO_2$ gas both at ground level and altitude.

"9. A number of circumstances occurred during Flight Test of Fire Emergency procedures in DC–6 aircraft which reflected the lack of thorough medical indoctrination in Flight Test procedures.

"11. Rapidly fatal results may follow exposure to high $CO_2$ concentrations. Personnel should not enter areas or compartments into which $CO_2$ has been discharged until adequate ventilation has ensued and then only with caution. If it is necessary to enter a $CO_2$ rich atmosphere, a closed respiratory system must be insured and the eyes must be adequately protected.

"12. The technique used for gas sampling aboard the DC–6 on test flights, while practical for collecting gas from the compartments below deck, was considered inadequate for use in habited areas of the aircraft. For physiological purposes accuracy is essential, and Haldane (29) years ago pointed out the error in assuming complete air exchange within hollow tubes such as gas pipettes when air is led in through a glass entry tube and the pipette is vented by a similar tube at the other end. Displacement or vacuum type sampling is a more acceptable and accurate method from the biochemical standpoint.

"15. Variations in $CO_2$ expansion when the gas is released into a 'cold' and a 'hot' below deck area can be expected. Cockpit and cabin $CO_2$ concentrations may vary under the two conditions depending on the pressure differential which exists across the

deck. Until this point is checked in flight, the $CO_2$ concentrations obtained during fire emergency procedures to date, are open to some question."

Dr. White made the following recommendations:

"1. Maximal allowable $CO_2$ concentrations for habited compartments in aircraft be established in commercial aviation and that the relevant material in this report be made available to the CAA, the aircraft industry, the Airline Medical Directors' Association, and the A T A as an aid in establishing and accepting industry-wide regulations in this regard.

"2. Research in the toxic effects of inspiring $CO_2$ gas at altitude be stimulated by whatever means is necessary to insure obtaining adequate data.

"3. Engineering, technical and flight test personnel, along with the medical department of the Douglas Aircraft Company, be made cognizant of the data contained herein.

"4. Appropriate information pertaining to $CO_2$ toxicity, symptoms, precautionary measures and flight test procedures for initial testing of $CO_2$ gear and smoke evacuation procedures be disseminated to all airline companies who use DC-6 equipment, providing this is consistent with the policy of the Douglas Company.

"5. The methods used for arriving at $CO_2$ gas concentrations in the cabin and cockpit during flight be improved to conform with accepted physiological procedures.

"8. Flight test of fire emergency procedure for the DC-6 be continued to: 1) more accurately determine peak $CO_2$ concentrations in the cockpit and cabin using refining methods; 2) determine the effect on cabin and cockpit contamination, if any, of firing $CO_2$ into a 'hot' rather than a 'cold' below deck compartment, especially if cabin pressure is stabalized (sic) in the attempt to prolong higher $CO_2$ concentrations in the compartments beneath the floor; * * *."

There is no evidence to rebut or dispute the accuracy or validity of Dr. White's report.

It is clear that Dr. White's report was never transmitted to United before the accident. The most that Douglas can claim in this regard is that Donald Douglas, Jr. testified that he had discussed the report with Christenson, United's flight safety engineer, before the Mt. Carmel accident. Christenson denies ever having heard of the Dr. White report from Douglas or any other official or employee, or from anybody else, before June 17, 1948, the date of the crash. But taking the Douglas testimony at face value, it would appear that his discussion was limited to time concentration values. The jury might well have questioned whether this so-called "discussion" constituted knowledge on United's part of the complete contents of Dr. White's report. Curious too in this connection is the testimony of Brush, chief pilot of Douglas. Referring to the White report he said: "I read most of the report, the parts which were most pertinent to what we were doing. I probably did not spend more than, oh, an hour on the report; a report of that nature cannot be properly evaluated in an hour."

On this vital subject relating to the hazard of undue concentration of $CO_2$ in cabin or cockpit quarters of the plane, it is of interest to note that key personnel in the Douglas organization had no knowledge of either the flight tests or of the White report before June 17, 1948. For example, Mr. Raymond, the Douglas vice president who has been referred to before, testified that no results of any tests involving the discharge of carbon dioxide in the fuselage of the airplane were called to his attention during the Modification program, and as to the White report, he said: "I didn't even know about it."

Dr. White had advised, in his report, the dissemination of the information contained therein to all users of the DC-6, as well as to the Civil Aeronautics Administration. On the original letter transmitting the report from White to Douglas, and at the time it was received by Douglas, a chief test pilot of Douglas wrote on the face: "Do not discuss with CAA" and transmitted it to two other pilots, Foulds and Peyton, Peyton being one of those pilots who had had the

disturbing experience with $CO_2$ in the January flight tests. And as the attorney for the plaintiff pointed out in his argument against the motion of Douglas to dismiss, at the close of the plaintiff's case, "if it were not for the fortunate circumstance that photostatic copies had been made of that original letter, before the erasure, which is in evidence, so that a comparison of the photostat and the original shows a complete erasure from the original, but shows the words had been there, 'Do not discuss with CAA,' shows that on the photostat, and it was finally conceded, after many many pages of testimony, that that is what the words were because they were not too legible at the time the photostatic copy was seen, but those were the words."

In order to avoid compelling inferences that here resided inescapable proof of negligence that contributed to the happening of the tragic crash, Douglas contends that the Proposed Civil Aeronautics Administration Safety Regulation Release, submitted in 1947 (Douglas Ex. G), and the United flight bulletin of June 16, 1948 (which was not released by United until after the Mt. Carmel accident) indicate that United knew of the toxic nature of carbon dioxide gas and the danger which might arise from excessive amounts thereof entering the cockpit. But the Proposed Safety Release, so far as the evidence discloses, was never actually adopted by the Civil Aeronautics Administration. The Release states that from the standpoint of toxicity, "$CO_2$ has a definite advantage over other (fire extinguishing) agents in that relatively higher concentrations (10% by volume) can be reached without seriously affecting personnel."

In the letter of A. W. Dallas, Director of Engineering, Air Transport Association of America, dated November 21, 1947, containing comments of the Proposed Safety Regulation Release as requested by the Civil Aeronautics Administration, the following is stated:

"Page 2—General Considerations

"The attempt under these general considerations has been to outline for information purposes the various factors connected with the different fire extinguishing agents.

We believe that such explanations are very helpful to the industry but in this particular case we feel that the information given is so limited that it becomes misleading to the reader. * * *"

Moreover, Dr. White's report states that the safe limit is a 5% concentration for not more than five minutes at sea level, and 4 volumes percent for not more than 15 minutes.

The Proposed Safety Release discusses $CO_2$ toxicity in general terms and is in no way specifically related to the emergency procedure established for the modified DC-6 to prevent hazardous concentrations of carbon dioxide from endangering flight personnel or passengers. Finally, although this document was known to Douglas as well as to United, Douglas' executives and key personnel stated, in testifying in this case, that the carbon dioxide hazards disclosed by the flight tests presented a completely new problem. Testimony given by Mr. Raymond has already been referred to. Mr. Donald Douglas, Jr., Director of Contract Requirements and Director of Flight Test for Douglas, testified as follows:

"Q. Was this experience of the flight crew on flights A–4 and A–5 on January 16, 1948, the first information that you had of any danger from excessive concentrations of $CO_2$? A. Any danger beyond the knowledge that I had previously that it was just a case of suffocation, in large amounts.

"Q. Did the experience which the flight crew had on January 16, 1948 come as a surprise to you? A. Why sure."

Mr. Robert Brush, chief pilot of Douglas when the flight tests were conducted in January and February 1948, testified on cross-examination as follows:

"Q. Well, I am asking you as of the time that you heard of the experiences on flights A–4 and A–5 which resulted in a meeting that day and a meeting the next day in which it was all discussed, and I am asking you whether that new problem wasn't one which centered around the discovery that fumes of carbon dioxide affected the personnel in the cockpit so that they couldn't properly do their work? A. That is correct.

"Q. That posed a menace, did it not, this new problem to the personnel which might affect the ability to manage and fly a plane safely?

"The Witness: Would you please repeat that? (Question repeated.)

"A. I•think I can best answer that by stating it brought up the necessity of establishing procedures to keep the $CO^2$ which you described as a menace from entering the cockpit.

"Q. Well, I described it as a menace, don't you think it fairly states the reason for the necessity for keeping the fumes out of the cockpit, otherwise it would be a menace? A. Yes sir, agreed.

"Q. That constituted the new problem which arose after it had been discovered on flights A–4 and A–5? A. Right."

As for the United bulletin of June 16, 1948, the evidence is undisputed that, prior to the Mt. Carmel accident, United used the rebreather type of oxygen mask only. It is also undisputed that the procedure established by Douglas required the oxygen supply to be shut off whenever carbon dioxide was discharged. Captain Holloway, chief test pilot of United, testified that the rebreather type of mask was plugged into the oxygen supply of the DC–6 airplanes used by United. Consequently, shutting off the oxygen supply, as the procedure directed, would mean that the wearer would get no oxygen except for that present in the air in the cockpit. Use of the rebreather type of mask, therefore, would not have increased the intake of oxygen.

Douglas also contends that the emergency procedure as established by Douglas was approved by the Civil Aeronautics Administration. This contention, however, ignores the important fact that the DEV 133 report submitted by Douglas to the Civil Aeronautics Administration, and the basis upon which the Civil Aeronautics Administration granted its airworthiness directives after modification, contained no reference to the effects of carbon dioxide upon flight personnel during the flight tests of January and February, 1948. Nor, as has been said hereinbefore, had Dr. White's report been submitted to the Civil Aeronautics Administration at the time when Douglas applied for approval of the emergency procedure, or at any time.

■ Enough has been said to indicate that there is substantial evidence to support the verdict against Douglas. It is of the utmost significance that at no time did Douglas, in any manual, instruct pilots of DC–6 to use one hundred percent oxygen masks. Nor did Douglas at any time prior to June 17, 1948 give any warning to United that rebreather type oxygen masks were inadequate to protect the wearer against the possible hazards of carbon dioxide concentrations in the cockpit. Hence the telegram sent out by Douglas on June 22, 1948, written by the same man who had requested Dallas to withdraw his warning and recommendations to operators of DC–6 of June 14, is significant as an admission by Douglas that its manual of operation was not complete. In this telegram he says: "Recent tests at this plant show that operation of the $CO^2$ fire extinguishers under some circumstances may result in excessive $CO^2$ concentrations in the cockpit of the DC–6. As an extra precaution it is urged that cockpit crews be ordered to use oxygen masks upon release of $CO^2$ to any fuselage compartment."

The jury had enough proof before it in respect to the insufficiency of the January and February flight tests, of the deliberate concealment of the White report, and of the failure, in the Douglas instructions as disclosed in its manuals, to order the use of full oxygen masks, to hold Douglas primarily responsible for the catastrophe. It is difficult to dismiss the thought that it was human failure—negligence—that caused the death of forty-three people; and that had Douglas distributed the White report to those in the aviation industry, and particularly to the Civil Aeronautics Administration and United, and followed its recommendations, the catastrophe might never have happened. Douglas' motion for judgment must be denied.

■ A motion for judgment notwithstanding the verdict and a motion for a new trial, are granted upon different bases. In Montgomery Ward & Co. v. Duncan, 311 U.S. 243, at page 251, 61 S.Ct. 189, at page

194, 85 L.Ed. 147, the Supreme Court stated as follows: "Each motion, as the rule recognizes, has its own office. The motion for judgment cannot be granted unless, as a matter of law, the opponent of the movant failed to make a case and, therefore, a verdict in movant's favor should have been directed. The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."

In diversity cases, it has been held that the question of legal sufficiency of the evidence in support of a claim is to be determined according to the local law applicable to the rights of the parties. See Stoner v. New York Life Insurance Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284.

In this case, the significant facts on which the litigation is founded occurred in Pennsylvania. Therefore, the court's duty is to follow the rules of conflict of laws prevailing at the place of trial. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The conflict of laws rule in New York is that generally the law of the forum regulates the weight of the evidence requisite to a recovery. See New York Annotations to the Restatement of Conflict of Laws, sec. 595, and cases cited. But the conflict of laws principle is not significant in the instant case; for whether the applicable local law be regarded as that of New York or of Pennsylvania, there is no substantial difference in the rule to be followed.

Under New York law, judgment notwithstanding the verdict may be granted where the verdict is not sustained by any evidence whatever. Dickerson v. Long Island R. Co., 266 App.Div. 852, 42 N.Y.S.2d 335; motion for leave to appeal den'd, 266 App.Div. 921, 44 N.Y.S.2d 344. However, a judgment notwithstanding the verdict will not be entered where the evidence raises an issue for the jury, as where there is evidence reasonably tending to support the verdict or where there is a substantial conflict in the evidence. See Sullivan v. Central Hanover Bank & Trust Co., 294 N.Y. 497, 63 N.E.2d 76.

Pennsylvania law is to the same effect. Duffy v. York, Haven Water & Power Co., 233 Pa. 107, 81 A. 908; Kindt v. Reading Co., 352 Pa. 419, 43 A.2d 145, 162 A.L.R. 1. Moreover, under Pennsylvania law, on a motion for a judgment notwithstanding the verdict for the plaintiff, the testimony should be read not only in the light most favorable to the plaintiff, but he must be given the benefit of every doubt and inference of fact pertaining to the issues involved which may reasonably be deduced from the evidence. Palmer v. Moren, D.C., 44 F.Supp. 704.

Douglas' motion for a new trial must also be denied, for the verdict is not clearly or decidedly against the weight of the evidence. See Meyers v. Hines, 199 App.Div. 594, 191 N.Y.S. 773; Reithof v. Pittsburgh Rys. Co., 361 Pa. 489, 65 A.2d 346. That the jury could have drawn different inferences or conclusions from the evidence than they did, or might properly have reached a different verdict, is not a ground for requiring a new trial, Orr v. William J. Burns, International Detective Agency, 337 Pa. 587, 12 A.2d 25; or that the trial judge would have reached a different conclusion from that of the jury. Dashnau v. City of Oswego, 204 App.Div. 189, 198 N.Y.S. 226.

As to the defendant, United, the question of its liability to the plaintiff must be considered in the light of the duty it owed to its passengers to use the highest care in the maintenance and the operation of its airplanes. The Civil Aeronautics Regulations provide that means must be provided to prevent hazardous quantities of carbon dioxide from entering habitable compartments. United contends that it relied upon Douglas and that failure to prevent hazardous carbon dioxide concentrations from entering the cockpit was negligence on Douglas' part. Insofar as concerns its duty to its passengers, however, United's reliance upon Douglas would not

lessen the duty owed. In Curtis v. Rochester & Syracuse Railroad Co., 18 N.Y. 534, an action against a railroad company for an injury received by a passenger, the court, 18 N.Y. at page 536, stated as follows: "The carrier, however, is in all cases bound to provide a safe and secure carriage for the transportation of the passengers; and nothing can exempt him from this responsibility, but the existence of some latent defect, which no reasonable degree of human skill and foresight could guard against; and this obligation extends to every species of appliance belonging to the carrier and used by him in the business in which he is engaged. Consequently, whenever it appears that the accident occurred through some defect in the vehicle, or other apparatus used by the carrier, a strong presumption of negligence arises, founded upon the improbability of the existence of any defect which extreme vigilance, aided by science and skill, could not have detected."

The Court regarded it as " * * * well settled that the carrier is responsible for the negligence or want of skill of every one who has been concerned in the manufacture of any portion of its apparatus. Hegeman v. Western Railroad Company, [13 N.Y. 9] 3 Kern. 9; * * *". See also Restatement of the Law, Torts, sec. 412; N. Y., N. H. & H. R. Co. v. Baker, 98 F. 694, at page 697, 50 L.R.A. 201; Southern Ry. Co. v. Hussey, 42 F.2d 70, 72, 74 A.L.R. 1172, affirmed 283 U.S. 136, 51 S.Ct. 367, 75 L.Ed. 908; and Venuto et al. v. Robinson et al., 3 Cir., 118 F.2d 679, 682, and 683, certiorari denied, C. A. Ross, Agent, Inc., v. Venuto, 314 U.S. 627, 62 S.Ct. 58, 86 L.Ed. 504.

The fact that United relied on the tests conducted by Douglas, and on Douglas' assurance that the problem was "adequately covered", as stated in Douglas' telegram to Dallas of June 14, 1948, did not lessen United's duty of care to its passengers. Therefore, the verdict in favor of the plaintiff against United must also stand. The issues of liability to the plaintiff, both as to the "active" negligence of Douglas, and the "passive" negligence of United, having thus been resolved in favor of the plaintiff, we proceed now, so far as the plaintiff is concerned, to the second question—the excessiveness of the verdict.

My reaction, when the jury reported, was that $300,000 is grossly excessive, and is not justified by the evidence in the case.

At the time of the death of DeVito, he was thirty-eight years of age and in excellent health. He had been employed steadily by one concern for some fifteen years; and had risen, from the position of stenographer, earning $35 a week, to become the head of the Easter Egg Coloring Department, a department doing a volume of business of about a half million dollars a year. In the last full year before his death, in 1947, he earned $9,038.12. There is nothing in the evidence to show what his earnings over the previous years had been. In other words, we have only the testimony that "his original salary, the first year, was $1,620" and that "in 1947 he earned $9,038.12". The treasurer of the employer company testified that DeVito had been a valuable and trusted employee, and that "he was on the way to advance himself still further."

All of the decedent's income, with the exception of $30 a week which he reserved for his own immediate needs and purposes, was required and used for the support of his family. In addition to the widow, there were two children, at the time of decedent's death, eleven and seven years of age, who survived. As to special damages, the item of funeral expenses amounted to $599.25. Deducting the amount retained by DeVito from his income in 1947, and deducting also amounts calculated as items for state and federal income taxes, leave a balance of $6,500 as the net income which was available for the maintenance and support of his family. DeVito's life expectancy according to the mortality tables, was thirty-two years. The present worth of an annuity of $1 payable over a period of thirty-two years at 2½ percent interest,[1] according to standard annuity tables, is $21.849. On the basis of these

1. This, in the light of investment returns, would seem a conservative rate.

figures then the present worth of an annual income of $6,500 would be approximately $142,000, to which should be added the funeral expenses, making the total approximately $142,600.

■ The Pennsylvania rule for determining damages is stated in Dubrock v. Interstate Motor Freight System, 3 Cir., 1944, 143 F.2d 304, 307, where the following is quoted from Gaydos v. Domabyl, 301 Pa. 523, 152 A. 549: "As a general rule, pecuniary loss embraces the present worth of deceased's probable earnings during the probable duration of deceased's life, which would have gone for the benefit of the children, parent, husband, or wife, as the case may be, and is broad enough to include the present worth of the value or probable services which would, in the ordinary course of events, be of benefit to one within this class."

■ In Mars v. Meadville Tel. Co., 344 Pa. 29, 23 A.2d 856, a wife's action for damages for causing the death of her husband, the court declared that the sum representing the present worth of the husband's life expectancy, as indicated by mortality tables, of the amount which the wife testified she had been receiving for maintenance and support, was not to be taken as the absolute criterion of the wife's pecuniary loss. It was held that the wife was entitled, in addition to the pecuniary loss, to compensation for the loss of other non-pecuniary benefits which the deceased husband, as a husband and father, would have bestowed on his family. The loss of service, of counsel and guidance and of gifts, to his children, are included in these non-pecuniary benefits. Visokay v. United States, D.C., 83 F.Supp. 367.

The plaintiff contends that, in view of the testimony as to his promising future, the jury could properly have found that within some years DeVito would have been earning at least four or five thousand dollars a year more, and "that annual earnings of $20,000 to $25,000 were well within the realm of probability." It is argued that this probable increase in future earning power, the likelihood of the deceased's living to an age far in excess of that expressed by the mortality tables, together with a consideration of such non-measurable factors as the loss of care and guidance to the children, fully warranted the verdict.

■ Nevertheless, the amount awarded "must bear some reasonable proportion to the injury sustained and the loss suffered by the plaintiff." Fornwalt v. Reading Co., D.C., 79 F.Supp. 921, 923.

In Cromley v. Speich, D. C., 19 F.Supp. 857, 858, affirmed 3 Cir., 1938, 94 F.2d 543, the court stated the measure of damages under Pennsylvania law as follows: "The amount of damages which members of the family are entitled to recover for the death of a husband and father is dependent on the pecuniary loss suffered by those who seek recovery. Pecuniary loss is the destruction of a reasonable expectation of pecuniary advantage from the deceased. It is not a matter of guess or conjecture, but must be based upon facts showing the contributions which the deceased made during his lifetime and facts upon which the jury can base an estimate of the probable contributions which he would have made for the balance of his natural life. Gaydos v. Domabyl, 301 Pa. 523, 152 A. 549. After arriving at an estimate * * which might reasonably have been expected, this amount should be reduced to its present value. * * * " See also Southern Pac. Co. v. Guthrie, 9 Cir., 186 F.2d 926.

In Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, at page 264, 66 S.Ct. 574, at page 579, 90 L.Ed. 652, the Court stated: " * * * even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential as well as direct and positive proof.' "

■ A verdict indicating that the jury arrived at an amount representing the present worth of the pecuniary contributions of the decedent to his family, based upon

the relevant data presented by the evidence, together with an added amount representing those factors for which there exists no precise yardstick for translating injury into money, but which amount is a sane and reasonable estimate, ought to prevail even though the court would have awarded less. However, where the amount awarded is far in excess of the present worth of what the evidence discloses was the actual contribution made by the decedent to the plaintiff, it must be concluded that the jury overstepped its power to act upon probable and inferential proof, and based its award upon speculation and guesswork, placing undue emphasis upon probabilities but losing sight of relevant data presented by the evidence in the case.[2]

■ Of course, it is generally conceded that the purchasing power of money today is less than it was at the time of the accident, and what the earning power of money will be in the future is open to speculation, perhaps only justified on the part of those who are trained in the economic field. In the effort to reach a just and reasonable award, taking all factors and circumstances into consideration, it would seem the plaintiff's recovery should not exceed $160,000.

Unless the plaintiff, within twenty days from the entry of the orders on these motions, files a stipulation accepting the reduced figure, the motion for a new trial will have to be granted.

There remains for consideration the cross-claim of United against Douglas, and the verdict of the jury in favor of Douglas. United contends that the policy of obstruction and confusion that was pursued by trial counsel for Douglas in this litigation deprived United of a fair trial. In the affidavit of William J. Junkerman in support of United's motion, attention is directed to a number of such acts on the part of trial counsel for Douglas. The following may be enumerated:

Throughout the trial, counsel for Douglas sought to create the impression that there was only one "official" operating manual for the DC-6 airplane; that such manual was the "Bible, which contained the symbol of approval of a governmental agency;" and that United "utterly ignored" this manual.

This Douglas manual was repeatedly, during the trial, and in the summation of Douglas' trial counsel, referred to as the "CAA approved airplane operation manual" or as the "government manual", or "the government operation manual" or the "Civil Aeronautics Administration manual" or "a government official manual", and always with the specific purpose of leading the jury to believe that it was the production of the Civil Aeronautics Administration. The fact is quite the contrary, for the evidence shows beyond the possibility of doubt that the manual was the production of Douglas, and that Douglas had secured the approval of the Civil Aeronautics Administration without informing the Civil Aeronautics Administraton of the White report or of any of its recommendations. The inevitable effect of such distortion was to lead the jury to believe that any deviation from the Douglas manual was a deviation or a violation of a directive of the Civil Aeronautics Administration, based on a full disclosure by Douglas to the Civil Aeronautics Administration of the hazards of the use of carbon dioxide in powerful concentrations in the cockpit without the protection of full oxygen masks.

To make this conduct even more reprehensible, in addition Counsel knew from the testimony of a Civil Aeronautics Administration representative that United's manual covering the emergency procedures, as issued in revised form May 10, 1948, and in effect on June 17, 1948, had been approved by the Civil Aeronautics Administration inspector.

At least a dozen times throughout the summation, Douglas' trial counsel endeav-

2. Upon inquiry I have been informed by the Clerk of this court that the verdict of $300,000, in a negligence action, based on the death of one individual, is the largest recorded. Indeed it is twice the sum of the largest jury award recorded in this court.

ored to drive home a violation by United of what he termed the Civil Aeronautics Administration manual. The repetition was with deliberate, devious design, despite the court's admonition.

Again trial counsel for Douglas sought deliberately to create the impression in the minds of the jury that the specific copy of Douglas manual, in evidence as Plaintiff's Exhibit 20, was the very same manual that had been allocated to the Mt. Carmel airplane. The true fact is that Plaintiff's Exhibit 20 had been prepared by Douglas as a duplicate, and that the serial and identification numbers of the Mt. Carmel plane had been inserted in it after the crash, and for the purposes of the trial. On the very first page of Exhibit 20, the manufacturer's serial number "42-871", and the Civil Aeronautics Administration identification number "NC 37506" are typewritten in clear black type, whereas all the rest of the manual appears in blue type.

■ The cross-examination by Douglas' trial counsel of United's expert witness, Dr. Floe, of the Massachusetts Institute of Technology, on the subject of the emergency pressure relief valve, affords additional evidence of a planned attempt to create confusion in the minds of the jury. The following is from that cross-examination:

"Q. Well, Doctor Floe, did you submit a copy of your report which has been introduced in evidence here, to the experts in the employ of the Civil Aeronautics Board? A. I did not submit a copy directly. No.

"Q. You know it was submitted, don't you? A. Yes.

"Q. Do you know that you were unable by your report submitted to those experts to convince them that the valve was open * * *?"

This questioning was inexcusable and indefensible, for its obvious implication was that the Civil Aeronautics Board had concluded in its report that the pilots of the Mt. Carmel plane had failed to open the valve when carbon dioxide had been discharged. In view of sec. 701(e) of the Civil Aeronautics Act, 49 U.S.C.A. § 581,

that "no part of any report or reports of the former Air Safety Board or the Civil Aeronautics Board relating to any accident, or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports", the question to Dr. Floe was grossly improper. Trial counsel was quite aware of the statute and its terms, for this specific section had been referred to on several occasions during the trial.

Another grossly improper remark of trial counsel for Douglas is the following passage quoted from his summation: "Now, that brings us to the use of this expert testimony where United brought in Dr. Floe to establish that the cabin pressure emergency relief valve in the back end of the airplane was open; * * *. We put on Dr. Tuckerman, whose opinion didn't cost the Douglas Aircraft Company one penny. We didn't buy him, and he didn't sell out to us. He didn't sell us his opinion."

Mr. Junkerman objected to that statement, and though I dislike interrupting counsel in summation, even at the risk of encountering a motion for a mistrial, I said: "I do not think it is a fair comment myself."

On this phase of the case, whether the emergency relief valves were open or closed at the time the airplane crashed, expert testimony was of first importance. United had called Dr. Floe as its expert, and he had testified that the valves were fully open. Douglas had offered the testimony of three other experts to show that the valves were closed. Dr. Floe's testimony was, therefore, crucial to United's case on that issue. Particularly was the comment harmful because the weight of the evidence was not to be determined by the number of witnesses called on either side, but by the quality and professional attainment of the witness.

■ For Douglas' trial counsel to make the comparison indicated in his summation I should call only unfortunate if I did not believe that it had been deliberately planned, and therefore the term "unfortu-.

nate" is inadequate as a characterization. The passage addressed to the jury was speciously designed to create the impression that Dr. Floe had "sold out to" United. Though it is proper to point out in summation that an expert witness has received professional service fees, it is quite a different matter to characterize such a witness as one who has been "bought". Aetna Life Insurance Co. of Hartford, Conn. v. Kelley, 8 Cir., 1934, 70 F.2d 589.

There are other instances of alleged misconduct on the part of trial counsel for Douglas to which United takes objection. It may be said that when viewed as isolated incidents they do not always appear serious, but in the light of the several acts oft repeated, they become significant as indicating, at least, efforts to confuse the proof. For example, Douglas' trial counsel made every effort to keep out of evidence the radio messages from NC 37506 received just prior to the crash from which it could be concluded that carbon dioxide had been discharged. Numerous objections were made, repeatedly and in great detail throughout the examination of the witnesses called by the plaintiff to establish that fact, and counsel's cross-examination was detailed and prolonged. Then curiously, despite such strenuous efforts on the part of trial counsel to keep knowledge of the discharge of the carbon dioxide from being presented to the jury, Douglas' second witness in its own case was asked by its trial counsel the following question:

"Q. Well now, Mr. Reaser, did you find there (at the scene of the Mt. Carmel crash) any part of the air-conditioning equipment of NC 37506 which gave any indication to you that carbon dioxide had actually been discharged in this particular airplane in flight? A. Yes sir. There was."

Then, at the direction of Douglas' trial counsel, Reaser went on to describe, from an examination of various parts of the air-conditioning system that it could be determined whether carbon dioxide had been discharged. He concluded: "* * * those were the two items which seemed to point most strongly, as far as the air-conditioning system was concerned, indicating that carbon dioxide had been discharged."

Other instances which invite criticism, though not so serious as the major offences that have been described, appear in the cross-examination of some of United's witnesses, for example of Davies, appearing in the stenographic record at page 1152, of Holloway at page 1486, of Blaschke at page 1838, and of Layman at pages 2512, 2513.

The subject cannot be dismissed without referring also to the examination of Douglas' witnesses Peyton and Raymond. Part of it may be quoted:

(Re-direct examination of Mr. Raymond):

"Q. If the court should want formal flight reports prepared of 31 flights, do you believe you could have it done for him by using this basic data?

"The Court: Do not put me in that position. This is merely because of a subpoena duces tecum that was served on you, and I felt that if you could comply with it, you should. If you can't, because of the absence of any such documents, then you should say so supported by the proof of those who know that there are no such reports in evidence. That is all. Mr. Raymond has testified about that."

(Re-direct examination of Captain Peyton):

"Q. So that are you positive that $CO^2$ was discharged in flight on A–2 and that it was into the forward lower baggage compartment, that you were the pilot, and that you weren't affected—

"The Court: Why do you have to repeat that? He so testified.

"Mr. Gallagher: Very well, your Honor, thank you.

"The Court: You are summing up, that is all.

"Mr. Gallagher: I thought that was a good idea, your Honor.

"The Court: It may have been a good idea, but I object to your doing it."

(Re-cross-examination of Captain Peyton):

"Q. I might say to you, Captain, or might ask you: Mr. Raymond testified that that report that you just were reading from was prepared some time in the summer of 1948; does that accord with your recollection?

"Mr. Gallagher: Just a moment, if your Honor pleases. I will object to the question. He is repeating a question or referring to the testimony of some other witness. Your Honor would not let me do it the other day—

"The Court: I dislike your reference to what I wouldn't let you do.

"I will overrule the objection and advise you to give heed to my admonitions.

"Mr. Gallagher: I am sorry, your Honor."

██ Of course, for misconduct of trial counsel to establish the basis for a new trial, it must be shown that such misconduct was prejudicial to the party complaining of the misconduct. Trial counsel sought by specious questioning to lead the jury to conclude that the valves were found closed. That was for the purpose of convincing the jury that the pilot and co-pilot of NC 37506, when carbon dioxide was discharged into a baggage compartment, had not properly followed the emergency procedure established for DC–6 airplanes.

It is apparent that both United and Douglas regarded that question as vitally important, for the issue was vigorously contested. Insofar as the plaintiff's case is concerned, as has been indicated in the earlier portions of this opinion, the evidence was substantial in warranting the jury in finding both United and Douglas liable, regardless of whether the valves were open or closed. Thus liability of Douglas and United could be based upon a finding that the procedures as established were inadequate to meet the hazards of carbon dioxide concentration when the gas was discharged under flight conditions.

But the verdict on the cross-claim of United against Douglas is quite a different matter. In finding for Douglas, the jury must have found that United was guilty of "active" negligence. If the jury had concluded from the evidence that the valves had been opened, it is fair to infer that it also found that United had, by its pilots, followed the procedure set forth in the Douglas manuals. Then, the evidence by which Douglas sought to prove that United was negligent in not properly following the procedure—for example, the absence of the warning note in United's operation manual, and the admitted ignorance of United's personnel of such warning note, a matter upon which Douglas laid considerable stress—becomes immaterial.

But it is important to note that there was substantial evidence to warrant the jury in finding that the dangers from carbon dioxide concentration could not have been avoided, even though the emergency procedure established had been followed. The inescapable inference then is that in order to find that United was "actively" negligent, it would have been necessary for the jury to find that United knew, or ought to have known, that such procedure was defective. There is evidence, and of a substantial nature, as has been indicated hereinbefore, that warranted a finding that United never knew, or ought to have known, of such defect in the procedure.

██ Of course, it must be recognized that on a motion for a new trial the evidence will be considered in the light most favorable to the prevailing party. In resolving the conflict in the evidence upon the question of the valves, then, the jury must be regarded as having concluded in favor of Douglas that they were closed at the time of the crash. It is particularly because of this inference that the misconduct of trial counsel for Douglas becomes significant and material, for his improper actions bear upon the evidence directed to the determination of that issue. How much, if any, the jury was influenced by the actions of counsel is not subject to determination. However, since it is not a single act which is involved but, as has been stated, numerous acts, and since they are related to a pivotal issue in the case, United's objections cannot be dismissed as being without foundation. On the contrary, United's case for recovery-over is supported by substantial proof.

Of course, the evidence does not directly disclose how seriously the flight personnel on NC 37506 were affected by the carbon dioxide. There were no survivors, and the radio contact was lost just prior to the crash. But there is testimony of eye witnesses along the road describing the progress of the plane in flight from the time of the final radio contact until the crash, covering an interval of approximately eight to ten minutes. If anything, these accounts would indicate that the airplane, during that period, was flying erratically, not along a direct course but in broken course, and at varying altitudes. This evidence would warrant an inference that the pilots were so adversely affected as to bring about a loss of control of the plane.

■ The specific degree of responsibility which can be laid to the ineffectiveness of the emergency procedure cannot be established from the evidence. In like manner, the specific degree of incapacitation of the pilots, assuming the valves were not opened, is also indeterminable. Consequently, although the responsibility for the amount of damage caused by each act cannot be established, both parties in these circumstances may be held liable for the entire damage as joint tort-feasors, even though contribution to the injury is different in degree. Holstein v. Kroger Grocery & Baking Co. et al., 348 Pa. 183; 34 A.2d 491; Hughes et ux. v. Pittsburgh Transp. Co. et al., 300 Pa. 55, 150 A. 153, 155.

In Holstein v. Kroger Grocery & Baking Co. et al., supra, defendant Ehler endeavored to pass the truck of the defendant, Kroger Company, when both were about 250 to 300 feet from plaintiff's car, approaching from the opposite direction. The Kroger Company's driver, instead of permitting Ehler to pass, increased the truck's speed and suddenly swerved to the left, when about 75 feet from plaintiff's car, causing it to crash into plaintiff's automobile. The Kroger Company appealed from a verdict for the plaintiff against both defendants, on the ground that "the negligence of the Kroger Company was not a contributing factor thereto, since it did not change, according to the jury's verdicts, the situation as it existed immediately before Kroger's truck struck the Ehrler car." [348 Pa. 183, 34 A. 492.] The court, in affirming the verdict and judgment entered thereto, stated: "This argument of defendant company completely ignores the fact that in the situation with which we are here concerned the matter of concurrent negligence is involved and not that of proximate cause. * * * The negligence of which the Kroger company was convicted was the act of the operator of its truck increasing its speed when Ehrler was attempting to pass and also in permitting the truck to swerve to the left. This failure of the truck driver to exercise due care in itself did not cause the collision * * * for Ehrler could have avoided the accident by decreasing the speed and falling behind the truck when he saw the Holstein machine approaching. Clearly, what caused the collision with the latter vehicle was the combined negligence of both defendants, * * *." 34 A.2d 491, at page 492.

The court also held that the facts presented brought the case within the principle, as enunciated in Hughes v. Pittsburgh Transp. Co., supra, that "where there would have been no injury whatever but for the continuing negligence of the defendant who first put the plaintiff in peril, and which existed when the negligence of the other turned the peril into actual injury, the negligences are concurrent and both defendants are jointly and severally liable for the injuries thereby occasioned."

In Hughes et ux. v. Pittsburgh Transp. Co., supra, the taxicab company whose driver stopped with the rear wheel of the taxi between the trolley rails, and the street railway company whose motorman should have seen the taxi's wheel there and had ample time to stop the car before the collision, were held concurrently negligent. At page 154 of 150 A. 153, the court stated: "The injured plaintiff was a passenger for hire in the taxicab, and the transportation company owed to her the highest degree of care and diligence in carrying her to her destination and enabling her to alight safely. * * * "True, this paramount right (to use the space

between the tracks to operate street cars) affords no excuse to the railway company for the clear negligence of its motorman; but neither does that clear negligence furnish any excuse for the taxicab driver's failure to exercise the high degree of care to which his passenger was entitled."

 If the jury concluded that the emergency pressure relief valves were closed, it might thus have found that the catastrophe was caused by the concurrent negligence of Douglas and United. Consequently the unfairness or speciousness of counsel for Douglas in the effort to establish that belief in the minds of the jury was prejudicial to United in a high degree. Indeed, that counsel may have had some doubts in his own mind as to the impression created by his conduct of the case before the jury is indicated in the opening remarks of his summation. He said: "If in the course of the trial I have done anything that caused you to have some feeling of displeasure or resentment towards me, I will ask you at this time to let bygones be bygones. * * *" Unfortunately, despite that expression of conscience, he repeated his offence.

There were instances when the court was forced to rebuke counsel for his conduct; for example, during the cross-examination of Dr. Floe already referred to, the court felt it necessary to interrupt the question being addressed to the witness, and stated: "That is a wholly improper question and I sustain the objection that was about to be made. I direct the jury totally to dismiss the question from its mind."

There were other instances where counsel appeared deliberately to misunderstand the court. During the examination of Captain Peyton, a witness called on behalf of Douglas, the following occurred:

"Q. Will you explain to his Honor, to the jury, and to me just what the purpose of that flight was, and that test, and also where this thing referred to as the hell hole is located and whether there was any carbon dioxide in the cockpit during that test?

"The Court: Do you remember all of that?

"The Witness: Yes, sir, I will try to. Would you like this in my own words?

"Q. Yes, I would like it in your own words. I do not want you to give it in mine because his Honor said you couldn't understand me.

"The Court: I did not say that. I asked him whether he remembered it all."

 I must conclude, therefore, that *improper insinuations and assertions both during the course of the trial and in summation* by trial counsel for Douglas were deliberately calculated to mislead the jury. The trial court has the power to set aside the jury's verdict in any case where the ends of justice so require. Brown v. Walter, 2 Cir., 1933, 62 F.2d 798; Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 1941, 122 F.2d 350; London Guarantee & Accident Co. Ltd. v. Woelfle, 8 Cir., 1936, 83 F.2d 325; New York Central Railroad Company v. Johnson, 279 U.S. 310, 49 S. Ct. 300, 73 L.Ed. 706; Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314.

This was a bitterly contested lawsuit. However, the fact that much feeling was engendered as a consequence thereof did not give license to overstep the bounds of legitimate advocacy.[3]

The verdict of the jury on the cross-claim will, therefore, be set aside. The jury had but the second cause of action set forth in the cross-claim to consider, for at the conclusion of the proofs, and before summation, the first cause of action, alleging damages for breach of contract, was set aside by the court on the ground that the notice of demand by United was not

---

3. This criticism is in no way intended to attach to the attorneys of record for Douglas. Trial counsel was not in their organization, and apparently had absolute control of the conduct of the case, both during the taking of depositions before trial and during the trial. He was not a member of this bar, but was on motion of the attorneys for Douglas granted permission to try the case.

made within a reasonable time as a matter of law. However, at that time there was not brought to the attention of the court matters that are set forth in the affidavit of William J. Junkerman. It is contended by United that the question of reasonableness of the notice mailed by United was for the jury under the authority of Whitfield v. Jessup, 31 Cal.2d 826, 193 P.2d 1; In re Flood's Estate, 217 Cal. 763, 21 P.2d 579. The important question then is when did United know, or when ought it to have known, of the breaches of contract committed by Douglas? It appears that immediately after the accident, the wreckage of the plane was placed under the control of the Civil Aeronautics Board; also that the emergency pressure relief valve control handle, the position of which would determine whether the pilots had followed the emergency procedures, was removed by the Civil Aeronautics Board, by Inspector Berman, and taken to his office; that twenty-eight days after the accident, the valve and control handle assembly were delivered by the Civil Aeronautics Board to Douglas in Santa Monica. Thereafter, on March 8, 1949, the assembly was delivered by the Civil Aeronautics Board to the Bureau of Standards, and later in that month returned by that Bureau to the Civil Aeronautics Board; and it was not until March 30, 1949 that the parts were submitted to Dr. Floe, the expert retained by United. His report was made on June 7, 1949, and the findings were contrary to those previously reported by Douglas. Thus it appeared to United then for the first time that the accident was due not to the failure of the pilots to follow the emergency procedures, as claimed by Douglas, but to the inadequacy of the procedures issued by Douglas and the improper tests made by Douglas with respect to the changes in the design. Finally, nine days after the report of Dr. Floe was issued, United informed Douglas of its claim.

If all this had been brought to my attention at the time the motion was disposed of, it would have appeared that the question of reasonableness of time was one not for the court but for the jury.

Accordingly on the retrial of the cross-claim, both causes of action stated therein will be considered at issue.

Submit orders on notice in accordance with the foregoing opinion.