See also D.C., 204 F.Supp. 507; D.C., 207 F.Supp. 120.

**Kurt STRAUSS, Plaintiff,**

v.

**DELTA AIR LINES, INC., Defendant.**

**Civ. No. 30610.**

United States District Court
E. D. Pennsylvania.

March 30, 1967.

Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

Rawle & Henderson, Philadelphia, Pa., for defendant.

## OPINION

SHERIDAN, District Judge.[1]

This is a civil action by plaintiff, Kurt Strauss, against defendant, Delta Air Lines, Inc., to recover damages for personal injuries suffered by plaintiff while a passenger on an airplane owned and operated by defendant.

Plaintiff is a citizen of Pennsylvania. Defendant is a Louisiana corporation with its principal place of business in Atlanta, Georgia. The court has jurisdiction under 28 U.S.C.A. § 1332. The parties stipulated that the substantive law of Pennsylvania applies.

On May 12, 1960, plaintiff, a paying passenger, boarded defendant's DC-8 airplane, bearing serial No. N805E, for a one-way flight from Chicago, Illinois, to Miami, Florida. He seated himself in one of the rear seats alongside the aisle and fastened his seat belt across his abdomen in the usual way. The seat belt remained fastened until the accident occurred. As the airplane approached the Miami airport, it encountered brief, but violent, turbulence during which plaintiff's seat belt broke. He was hurled out of his seat, striking his head against and partially penetrating the overhead of the cabin. Defendant admitted that the seat belt broke at its insertion on the left side; that seat belts as such are intended for the safety of passengers against turbulence and also the type of turbulence that was encountered on May 12, 1960; and that at the time of the accident the plane was descending at about 1200 to 1500 feet a minute, with a speed of about 290 to 305 knots.

The seat was attached to the aircraft frame. On the back of the seat and at the bottom, a torque tube or bar, approximately two inches in diameter, ran across the width of the seat. A cable, part of the seat belt assembly, fitted or looped around the torque tube at each side of the seat. The "barrel portion," which looked like a whistle, was at one end of the cable. When the cable was looped around the torque bar, the barrel portion was fitted into a "swaged ball" joint. The swaged ball was attached to the other end of the cable and the webbed belt part of the seat belt. The cable consisted of a number of strands of wire completely covered by a plastic sheath. Defendant admitted that failure of the seat belt took place in the cable in the area of the swaged ball end fitting.

N805E was the fifth of six DC-8 airplanes acquired by Delta from Douglas Aircraft Corporation. It had been delivered to Delta on November 5, 1959. At the time of the accident, 1363 flight hours had been accumulated. The earliest DC-8 acquired by Delta, N801E, had at the time over 1815 flight hours. The latest, N806E, had 1243 flight hours. On May 13, 1960, Delta Engineering Department issued an inspection order which required an inspection of all DC-8 seat belts for frayed cable assemblies. Fraying of the cable assembly means that some of the strands of wire constituting the cable were broken. The inspection disclosed 46 frayed cables in N801, 62 in N802, 54 in N804, 8 in N805, and 21 in N806. The number in N803 was not reported. In each instance the fraying was adjacent to the attachment of the swaged ball end of the cable. As a consequence of this condi-

---

1. Chief Judge, Middle District of Pennsylvania, sitting by special designation.

tion, Douglas modified the portion of the cable assembly and the barrel section to which it was secured.

The plaintiff proceeded against the defendant on two theories of liability. First, that the cable, as installed, had a patent weakness at insertion of the cable into the swaged ball fitting, that is, that there was a potential for failure by "fatigue" at that point. Plaintiff contended that this should have been detected by a person with knowledge of maintenance and mechanics, and hence by representatives of Delta who were stationed at the Douglas plant during the time the airplanes were assembled. Second, that defendant failed to utilize an adequate inspection system which would or could have disclosed that the seat belt attachments were failing, and that had such an inspection been made, the accident would have been avoided.

At plaintiff's request, only the liability issue was tried. The jury returned a verdict for the defendant. In his motion, plaintiff assigned several reasons for a new trial. At the request of the parties, the motion was submitted on briefs.

Plaintiff abandoned all but two of the reasons in his motion.

■ Plaintiff argues first that it was error to have permitted defendant to introduce evidence of the type of inspection that defendant would have made at a 2500-hour overhaul. As a part of its defense to the alleged failure to use a proper inspection system, defendant undertook to show the nature of its inspection and the maintenance program for DC–8's as it existed at and prior to the date of the accident. Since the DC–8's were new aircraft recently acquired by Delta, certain phases of the inspection program were in the development stage. The program, as it applied to the seat belts, had three main aspects: the daily inspection, the 220-hour flight time inspection, and the 2500-hour flight time inspection. The daily inspection merely insured that there was no visible damage or damage in a general sense. The second aspect, set forth in Delta's main-

tenance manual, required that at 220 flight time hour intervals, the inspectors were generally to "inspect safety belts and check security." Mr. Burnette, assistant superintendent for inspection at Delta, testified to the standard practice in carrying out these general inspection requirements. To test the cable for security the seat belt was pulled upon to see that it was secure to the seat. This test would not disclose incipient fatigue cracks or fractures of the individual strands of cable under the plastic sheathing, unless, of course, the number of strands fractured were so numerous as to permit a failure of the seat belt when one pulled upon it. The witness testified that because of the plastic sheath, "[i]t is practically impossible to inspect the swaged ball end [of the cable assembly] when it is installed in the airplane." Company records showed that the seat belts were last inspected in this manner on April 24, 1960, or about 20 days before the accident occurred. That such inspection was the practice of Delta and that the records showed it had been performed was relevant to the question of the existence of absence of negligence. Cf. Haines v. Reading Co., 3 Cir. 1950, 178 F.2d 918; Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc., S.D.N.Y. 1957, 152 F.Supp. 903, 930–932; Murphy v. American Barge Line Co., W.D. Pa.1948, 76 F.Supp. 276.

None of defendant's DC–8's had 2500 flight hours at the time of the accident. Defendant contended that in view of plaintiff's claim of an inadequate inspection program, it was entitled to show that the program did provide for a fuller inspection but the time interval for reaching it had not occurred. Plaintiff objected because after the accident the seat belts were changed so that when the 2500-hour inspection was made, the airplanes had an entirely different seat belt assembly. The court limited this line of testimony to a showing of the inspection procedure at and prior to the time of the accident; to a showing of what would have been the inspection procedure at 2500 hours, if this plane

had gone 2500 hours, and there had been no modification of the seat belt attachment.[2] Plaintiff made only a general objection to the line of testimony as limited by the court.

■■ The 2500-hour inspection was a major overhaul. The 2500 hours was fixed by the maintenance review board, composed of representatives of the Federal Aviation Agency, the airline industry, and aircraft manufacturers, before Delta took delivery of any DC–8's. The 2500-hour overhaul program was incorporated into FAA Operations Specifications issued to all users of the DC–8's. These specifications provided for the removal of all seats, their disassembly, and a complete inspection. There was testimony that removal of seats would include removal and inspection of seat belts. At the time of the accident, Delta had not formulated written procedures in manual form for inspection of the seat belts because the airplanes had not reached the 2500-hour point. A card system maintained by Delta, however, referred to the requirements of the specifications for the removal of seats at the time of major overhaul. On the basis of these requirements and previous experience with Douglas manufactured seats in DC–6 and DC–7 aircraft, and previous experience in the examination of seat belt cables, witnesses testified to the procedure the overhaul shop would have followed in making a 2500-hour inspection. It included a complete disassembly of the seats, seat belts, and attachment to the seat belts, the opening of the cable and an examination of the barrel and swage ball for wear, and the examination of the cable with a 10-power magnifying glass in accordance with past procedures for examination of cables. This testimony was relevant to show Delta's practices at the time the accident occurred which was relevant to the issue of an adequate inspection program. Cf. 2 Wigmore, Evidence § 376. Plaintiffs argument goes to the weight of the evidence, not to its admissibility. Moreover, in view of plaintiff's general objection after the court had imposed limitations on this testimony in accordance with his specific objections, plain-

---

2. "Q. [By defendant's counsel] Now, would you explain what would be done by way of inspecting the seat and particularly the seat belt and attachment at the 2500-hour overhaul period?

MR. BOROWSKY: [Plaintiff's counsel] That is objected to. None of these planes were subject to that.

THE COURT: That is true, but I think in view of the issues here it is proper. We will permit it.

MR. BOROWSKY: If Your Honor please, when 2500 hours would have appeared on these DC–8s, they would have had an entirely different type of assembly than was there at the time of this occurrence.

THE COURT: Well,—

MR. BOROWSKY: The change was effected in *August of 1960 with a new barrel*, and there were different attachments as of May 1960.

THE COURT: I think you can qualify your question then.

MR. McCABE: [Defendant's counsel] Yes, sir. I will state the purpose, the reason for it, Your Honor, which is this: that the plaintiff claims that the inspection program as established by Delta for its airplane was inadequate.

THE COURT: Yes.

MR. McCABE: I am saying that there was a feature of this program that did provide for a fuller inspection than what we have just seen, but the time interval for reaching it had not yet occurred.

THE COURT: You may show it. The answer should be given in the light of the original seat belt attachment, even though later on there was a modification. Isn't that what your question is?

MR. McCABE: Yes, sir. What is the procedure—

THE COURT: What would have been the procedure? That is what you should say. What would have been the inspection procedure at 2500 hours if this plane had gone 2500 hours and there had been no modification of the seat belt attachment. I will permit that.

MR. McCABE: Yes, sir.

THE COURT: I will permit that type of question.

MR. McCABE: That will do.

THE COURT: I take it plaintiff's counsel objects to that.

MR. BOROWSKY: Yes, sir.

THE COURT: Your objection is noted."

tiff cannot now be heard to complain. Rule 46, Fed.R.Civ.P.

Plaintiff next complains that the court erred in refusing to instruct the jury in accordance with plaintiff's point for charge No. 4. This point was:

"4. In the light of the duty of a common carrier by air for hire to exercise the highest care in the maintenance and operation of its airplanes for the safe transportation of its passengers, it cannot relieve itself of this duty by relying upon the manufacturer of the aircraft where a defective appliance exists, unless it has exercised every reasonable degree of human skill and foresight to discover and remedy such a defect. DeVito v. United Airlines, [D.C.] 98 F.Supp. 88, 98."

Prior to the closing argument, the court discussed the points for charge with counsel. Defendant objected to plaintiff's point No. 4 because it did not accurately state the law of Pennsylvania in that defendant was entitled to rely on the expertise of the manufacturer and the FAA in the matters related to design, construction and approval of the aircraft, and at least as to any inherent defective design, it was not required to take any further action. The court pointed out that the jury could consider such matters but that they did not insulate defendant from liability and indicated that it would cover this in the general charge. Upon completion of the charge, plaintiff objected to the failure to charge point No. 4 as requested. The court stated that point No. 4 was denied largely because of the language, "every reasonable degree of human skill and foresight."[3] Plaintiff did not comment on the court's reason and did not note a specific objection thereto.

The point had been formulated from language in DeVito v. United Air Lines, supra, a case from the Eastern District of New York which purported to apply Pennsylvania law. That court, however, relied on New York authority which contained the language "every reasonable degree of human skill and foresight." Plaintiff cited no Pennsylvania authority in support of the point. An examination of the New York authority relied on in DeVito shows that it applied almost an absolute duty on a carrier to provide safe passage for its customers. Cf. Griffith v. United Air Lines, Inc., 1964, 416 Pa. 1 at page 8, 203 A.2d 796. Moreover, to charge that a carrier must exercise "every reasonable degree of human skill and foresight" might confuse a jury since it fails to take into account the high level of expertise which aeronautical designing and manufacture require and develop, and which is not expected of air carriers. Therefore, it did not seem proper to charge an air carrier with a duty which exceeded the expertise of its own personnel with respect to design and manufacturing techniques. The DeVito case seemed to overlook this consideration and seemed to assume that an air carrier is expected to have the same level of aeronautical expertise as the designers and manufacturers of aircraft require and develop. The court, therefore, charged in accordance with the degree of care required of common carriers according to Pennsylvania Supreme Court decisions. Stevens v. Reading Street Railway Co., 1956, 384 Pa. 390, 121 A.2d 128; Seburn v. Luzerne & Carbon Co. Motor Transit Co., 1959, 394 Pa. 577, 148 A.2d 534; Griffith v. United Air Lines, Inc., supra. The court characterized this as a duty to exercise the "highest" degree of care, the language of Stevens, rather than on the basis of a "high" degree of care, the language of other Pennsylvania cases.

■■ In his brief, plaintiff does not now comment on the court's reason for not charging in the language of the point for charge. Rather, counsel now indicates for the first time that the court erred in not charging the part of the

---

3. Counsel for plaintiff, in his closing argument, told the jury that Delta had a duty to do everything "humanly possible" to see that the equipment and appliances in that plane were safe and sound.

point which states that a carrier cannot relieve itself of the duty owed by relying upon the manufacturer of the aircraft. Because of the failure to make this reason known so that the trial judge was informed of possible error, plaintiff cannot now be heard to complain. Sowizral v. Hughes, 3 Cir. 1964, 333 F.2d 829. However, the court substantially charged in this vein. After describing the duty owed as one of the highest degree of care, the jury was instructed that even if it found that Douglas Aircraft was negligent, this would not relieve Delta if the jury found that Delta was also negligent, and that such negligence was a proximate cause of the accident. The jury was instructed on the law of concurrent negligence and was told there may be more than one proximate cause. The court then stated:

"The plaintiff contends that in view of that situation that Delta should have recognized that this was designed improperly and should have been on guard and therefore *they should not have blindly accepted the design of Douglas or the certification of the agency.*

"You also, as men and women of experience, have a right to consider the exhibits yourself. Look at them. They are in evidence. You can take them out in the jury room with you.

"I say this to you categorically— and I think defendant's counsel in his argument admitted it—*that a defendant cannot blindly accept something such as an airplane or a bus simply because it has a certificate from a governmental agency.* They can't just say that as long as we have a certificate we don't have any duty at all. Their duty goes beyond that. But the question is did they violate the duty in this case under the principles that I am giving you." (Emphasis supplied.)

 Further, a reading of the charge as a whole indicates that the duty of a carrier was adequately covered. A litigant is entitled to have the trial judge advise the jury of applicable claims and theories of law, but the court is not required to give instruction in the language and form requested. Oliveras v. United States Lines Co., 2 Cir. 1963, 318 F.2d 890.

 Finally, other parts of the requested point were inaccurate and the court was not bound to separate that which was accurate and rewrite the point, particularly since this was adequately covered in the charge. Cf. County of Todd, Minn. v. Loegering, 8 Cir. 1961, 297 F.2d 470; Harding v. Evans, M.D.Pa.1962, 207 F.Supp. 852.

Plaintiff's motion for a new trial will be denied.