35 N.J. Super. 319 (1955)
114 A.2d 278
MARGARET SHAW, PLAINTIFF-APPELLANT,
v.
CALGON, INC. (A FOREIGN CORPORATION LICENSED TO DO BUSINESS IN THE STATE OF NEW JERSEY), DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 1955.
Decided May 6, 1955.
*321 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. James J. Cannon argued the cause for appellant.
Mr. Charles P. DeYoe argued the cause for respondent (Mr. Charles C. Stalter, attorney; Mr. Archibald Kreiger, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
After hearing argument the court announced that the judgment would be affirmed and a written opinion filed at a later date.
*322 Plaintiff sued defendant to recover damages for personal injuries resulting from her use of defendant's product, "Calgonite." She appeals from the judgment of involuntary dismissal entered by the Law Division on defendant's motion made at the close of plaintiff's case.
Defendant manufactures an alkaline product called "Calgonite," sold in a gold-colored box and intended mainly for use in automatic dishwashers. It also manufactures a product known as "Calgon," which is a water softener and is sold in a silver-colored box. Plaintiff, a nurse, had been employed by a Mrs. Martone to care for her mother-in-law. Her nursing services being at an end, she continued doing housework for Mrs. Martone three days a week. On April 3, 1953 Mrs. Martone asked her to clean the venetian blinds, and instructed her to use the Calgon in water. Plaintiff knew that Calgon was a water softener made by the same company which produced Calgonite, and that it came in a silver-covered box. Mrs. Martone had both products, and used Calgonite in her dishwasher only. The two boxes were stored underneath the kitchen sink. Plaintiff testified she reached for the Calgon, but mistakenly picked up the box of Calgonite. She did not look at the box before using it, but poured some of its contents into a pail of hot water and began to wash the blinds. She claims she used "maybe a teaspoon or a little bit more" in something over a gallon of water. However, she admitted she did not measure the Calgonite but just "poured it in." She immediately felt a burning sensation on her arms and noticed that the rubber gloves she was wearing (we have nothing more than her word that she wore the gloves) had begun to disintegrate at the wrists. It was then that she looked at the box and found she had used the wrong product. Plaintiff further testified she could find no antidote printed on the Calgonite package although she read that the product was highly alkaline, the specific alkali not being mentioned. She resorted to home remedies but got no relief. The burning sensation became worse. She then sought medical attention and was treated by several physicians.
*323 The treating dermatologist testified that plaintiff had suffered a chemical (detergent) burn, and that her condition was not an allergenic reaction. His initial diagnosis was contact dermatitis. At the time of the trial she still had irregular patches of dermatitis on her elbows and under the armpits, the forearms exhibited numerous small depressed white scars, and the skin over her hands and arms was generally thin, dry and sensitive. The specialist believed the condition to be permanent; plaintiff would have to avoid wearing wool and silk, use a special kind of soap, apply certain ointments to the affected areas and take certain medicines.
The original complaint claimed that as a result of using Calgonite "in connection with a washer," and because of its dangerous and injurious ingredients, plaintiff was severely burned and otherwise injured. Defendant's answer set up the following defenses: it violated no duty owed plaintiff; it was not guilty of any negligence that was the proximate cause of the alleged injuries; plaintiff was guilty of negligence contributing proximately to the alleged happening in that she failed to exercise due care for her own safety under the circumstances then existing, failed to exercise proper observation and precaution, and was otherwise careless and negligent; assumption of risk; and unavoidable injury. The pretrial order stated that the action "sounded in negligence." It contained a stipulation that defendant manufactured the Calgonite in question and that the box bore the printed statement about to be mentioned. The order set out plaintiff's contention that defendant was negligent in that it failed to give sufficient warning as to the dangers attending the use of Calgonite, and defendant's denial of any negligence and its separate defense of contributory negligence and assumption of risk. The pretrial order noted that plaintiff had received workmen's compensation.
It is to be observed that after the entry of the pretrial order plaintiff filed two amended complaints. The first alleged that the Calgonite container did not bear a statement of its specific ingredients and so failed to give adequate warning *324 as to excessive alkalinity; and that as a result of defendant's neglect in these respects plaintiff was injured. The second amended complaint contained the additional allegation that the container carried no notice of any antidote or neutralizing agent to be used in case of injury, and that as a result of defendant's neglect to warn the public of excessive alkalinity and to print an antidote or neutralizing agent on the container, plaintiff was injured while innocently using the product. Defendant set up the same defenses as before to these amended complaints.
There should have been another pretrial conference resulting in an amended order that would have reflected the new allegations on which plaintiff relied. This is the better practice, for it results in a more definitive trial of the issues. Since the abbreviated record reveals sufficient to indicate that the trial generally followed the allegations set out in the second amended complaint, we will dispose of the appeal as though there had been an amended pretrial order.
The Calgonite box was placed in evidence. The following printing appears on the back of the box:

"DIRECTIONS

CALGONITE

For Mechanical Dishwashing
Calgonite gives Twin-Action in mechanical dishwashing. Its highly alkaline silicates provide positive cleansing power in removing stubborn soil and grease. Its water conditioning agent, Calgon brand sodium phosphate glass, assures maximum freedom from film and stain, not only on dishes, but in the machine as well."
Directions follow for the use of Calgonite for china, glassware, silver, etc., in dishwashing machines ("one rounded tablespoonful of Calgonite per gallon of water") and for aluminum ware ("two to three tablespoonfuls of Calgonite per gallon of water"), with the comment that "While general in character, these instructions will give satisfactory results in any of the better dishwashing machines." The following then appears:
"IMPORTANT  DO NOT USE for bath, shampoo, or cleansing tasks involving contact of the hands, with the wash water. If Calgonite is spilled on linoleum, wipe up immediately and rinse with water."
*325 On the side panel of the box there is printed:

"CALGONITE
is fine for certain difficult cleaning tasks. Avoid contact of the hands with Calgonite solutions; use either rubber gloves or a brush. Rinse thoroughly.
Try it for greasy tile or concrete floors, white sidewall tires, rubber matting. DO NOT USE on linoleum floors or non-alkali-resistant painted surfaces. Launder badly-soiled white or color-fast cottons by dissolving a tablespoonful of Calgonite and your favorite soap in your washer before adding clothes. Do not use on silk, wool, or rayon."
In the pretrial order the parties also stipulated that defendant manufactures Calgon, a water softener, sold in a silver-covered box.
In granting defendant's motion for involuntary dismissal, the court held that plaintiff had failed to prove negligence on the part of defendant, taking special note of the warnings contained on the box that contact of the hands with Calgonite solutions should be avoided. Plaintiff took exception to this determination on the ground there was a question of fact which should have been submitted to the jury, there being insufficient warning and, further, no notice of how a counter-reagent could be used in case of injury.
Plaintiff's first point is that the trial court erred in granting defendant's motion at the close of plaintiff's case because it should have applied the doctrine of res ipsa loquitur and required defendant to put in its case. The question of the applicability of that doctrine was not raised or argued below. Plaintiff has failed to appraise this court of that fact on appeal, as required by R.R. 1:7-1(c) which provides:
"* * * If the questions involved [on appeal] include any not presented to the court below, this fact shall be noted. The foregoing requirements are to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in or necessarily suggested by the statement of questions involved."
Indeed, plaintiff's statement of questions involved nowhere explicitly sets forth that the question of the applicability of *326 the res ipsa loquitur doctrine is raised. However, it is fairly comprehended within that statement since plaintiff claims error by the trial court in holding there was no negligence on defendant's part. Although the doctrine is only now invoked, we will consider it because of its substantial relation to plaintiff's cause of action and the desirability of a judicial treatment of the subject in the present factual setting.
Plaintiff alleged specific negligence in her pleadings, namely, defendant's failure to state on the container the ingredients of Calgonite, thereby giving no adequate warning as to its excessive alkalinity, and its further failure to set out the antidote or neutralizing agent that might be used in case of injury. Testimony to this effect was adduced.
Where plaintiff introduces specific evidence of negligence, the question arises whether he may still rely upon the inference of negligence provided by the res ipsa loquitur doctrine. It has been said that where the facts are disclosed by evidence there is no room for inference, or that by attempting specific proof plaintiff has waived the benefit of the doctrine. Heffter v. Northern States Power Co., 173 Minn. 215, 217 N.W. 102 (Sup. Ct. 1927). However, the better view is that although plaintiff is bound by his own evidence, proof of specific facts should not necessarily exclude inferences. It is generally agreed that the introduction of evidence which does not purport to furnish a complete explanation should not deprive plaintiff of the benefit of the doctrine. Cassady v. Old Colony St. R. Co., 184 Mass. 156, 68 N.E. 10, 63 L.R.A. 285 (Sup. Jud. Ct. 1903); Glasco Electric Co. v. Union Electric Light & Power Co., 332 Mo. 1079, 61 S.W.2d 955 (Sup. Ct. 1933).
A similar problem arises where plaintiff has alleged specific negligence in his pleadings and thereafter seeks to take advantage of the res ipsa loquitur doctrine. As pointed out in Prosser on Torts (1941), § 44, pp. 307-308, courts have taken four positions on the question: (1) by his specific allegations plaintiff has waived or lost his right to rely upon the doctrine (O'Rourke v. Marshall Field & Co., 307 Ill. 197, *327 138 N.E. 625, 27 A.L.R. 1014 (Sup. Ct. 1923)); (2) he may take advantage of it if the inference of negligence to be drawn supports the specific allegations (Atkinson v. United Railroads of San Francisco, 71 Cal. App. 82, 234 P. 863 (D. Ct. App. 1925)); (3) the doctrine may be applied only if the specific pleading is accompanied by a general allegation of negligence (McDonough v. Boston Elevated R. Co., 208 Mass. 436, 94 N.E. 809 (Sup. Jud. Ct. 1911)); and (4) it is available without regard to the form of the pleading (Briganti v. Connecticut Co., 119 Conn. 316, 175 A. 679 (Sup. Ct. Err. 1934)). It would appear that if the specific allegations are accompanied by a claim of negligence in general terms, defendant has at least received notice that plaintiff is not relying exclusively upon the specific allegations and so cannot claim that he had been surprised or misled.
There is, however, no need to pass upon the procedural effect of plaintiff's pleading specific negligence and introducing specific evidence thereof, on the availability of the doctrine. Under our practice the pretrial order supersedes the pleadings where inconsistent therewith and controls the subsequent course of action unless modified at or before the trial. R.R. 4:29-1(b). As noted, the pretrial order stated that the action "sounded in negligence." Negligence being the general issue, plaintiff would be entitled to the inferences stemming from the res ipsa loquitur doctrine if the several elements calling the doctrine into play were present.
Negligence may be proved by circumstantial evidence, one type being that which has been given the name of res ipsa loquitur. Ever since Baron Pollock casually gave such circumstantial evidence its now familiar Latin label (Byrne v. Boadle, 2 H. & C. 722, 159 Eng. Rep. 299 (1863)), the doctrine has been a source of differences of opinion and a target of criticism. See Prosser on Torts (1941), § 43, p. 292, note 74, and the dissenting opinion of Chief Justice Bond in Potomac Edison Co. v. Johnson, 160 Md. 33, 152 A. 633, 636 (Ct. App. 1930), where he said that the doctrine "adds nothing to the law, has no meaning which is not more *328 clearly expressed for us in English, and brings confusion to our legal discussions. It does not represent a doctrine, is not a legal maxim, and is not a rule." Cf. Alston v. J.L. Prescott Co., 10 N.J. Super. 116, 119 (App. Div. 1950).
The doctrine is, however, now firmly embedded in our cases. It finds its most frequent expression in the oft-quoted statement of our former Court of Errors and Appeals in Mumma v. Easton & Amboy R. Co., 73 N.J.L. 653, 658 (1906):
"* * * This principle is that when through any instrumentality or agency under the management or control of a defendant or his servants there is an occurrence, injurious to the plaintiff, which, in the ordinary course of things, would not take place if the person in control were exercising due care, the occurrence itself, in the absence of explanation by the defendant, affords prima facie evidence that there was want of due care."
There have been attempts at a redefinition of the doctrine by some of our courts  see Van Staveren v. F.W. Woolworth Co., 29 N.J. Super. 197, 199-200 (App. Div. 1954)  but the Mumma statement presently appears to be the established formula in this State. Cf. Prosser, op. cit., § 43, p. 291; 9 Wigmore on Evidence (3d ed. 1940), § 2509, p. 380 et seq.
It is sometime said that one of the conditions necessary for the application of res ipsa loquitur is that the accident must not have been due to any voluntary action or contribution on the part of plaintiff. See, for example, Prosser, § 43 p. 300. This absence of fault in a plaintiff must not be considered as part of the definition of the doctrine. It is nothing more than the requirement found in all negligence cases  that before a plaintiff may recover he himself must be free from contributory negligence.
Even had plaintiff, at the close of her case and when defendant made its motion for involuntary dismissal, insisted upon the application of the res ipsa loquitur doctrine and demanded that defendant go forward with its case, she could not have prevailed. By her own testimony plaintiff, who as a trained nurse and a houseworker had been in and about the Martone home for some time, did not exercise due care *329 in the circumstances. Without looking, she blindly reached out for the box of Calgon which Mrs. Martone had directed her to use, did not look to see what box she actually had in her hands (thereby completely failing to read the directions thereon), and then proceeded to pour an unspecified amount into the pail of hot water. She permitted the solution to come in contact with her forearms, as evidenced by her testimony that they immediately began to burn. Plaintiff's negligence was the proximate cause of her chemical burn, and this negligence operates to bar her from the right to recover.
Plaintiff relies on the exposition of res ipsa loquitur in Van Staveren v. F.W. Woolworth Co., above. There is no need to discuss the principal tests there projected for the application of the doctrine. The facts of that case completely distinguish it from those under consideration, if for no other reason than that negligence on the part of the plaintiff was there totally absent. Nor does plaintiff's cause gain support from the so-called "exploding bottle" cases.
Plaintiff's second and final point is that the court should take judicial notice that detergents are inherently harmful. The brief breaks this argument down into three sub-heads: (a) the nature of the contents was not stated on the Calgonite box, making it impossible to apply proper medical remedies for treatment of the resulting chemical burn; (b) the box carried no notice of an antidote, so that plaintiff or her doctor could not readily apply a remedy; and (c) "This is a new phase of the law, and there are no decisions on the direct issues." We are presented with no more than this bare statement, supported by no argument or citation of cases. We need say nothing more than that such a brief and the argument made thereunder is entirely inadequate and ineffective.
This court cannot and will not take judicial notice that detergents generally are inherently harmful. Detergents are a by-product of our chemical age and are used in a multitude of instances instead of soap, soap products and scouring compounds. Most of them can be and are used daily in solution, without harmful effect. There undoubtedly are *330 some detergents recommended for household use which, because of their high alkaline content, may be harmful to normal skin. In such cases the careful manufacturer, as here, not only gives directions for use but warns against allowing the skin to come in contact with the solution containing the detergent.
There is no dearth of authority on the subject of the liability of a manufacturer who launches a product which results in injury to the user. The law has come a long way since Winterbottom v. Wright, 10 M. & W. 109, 152 Eng. Rep. 402 (Exch. 1842), and the movement for extending the frontier of product liability did not halt with MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916 F, 696 (Ct. App. 1916). The trend of the law is more and more toward holding a manufacturer responsible for injuries suffered by the user of his product. This trend has been reviewed in many cases and by many writers. See, for example, the recent exposition in O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 328-335 (1953), and see Prosser on Torts (1941), § 83, pp. 673-693.
That the law is alert to the need of extending the doctrine of product liability to new situations is illustrated by those cases dealing with the liability of a manufacturer or supplier to an allergic consumer. See 49 Mich. L. Rev. 253 (1950); 51 Mich. L. Rev. 447 (1953).
There is general agreement that a seller or other supplier of chattels for a consideration may be liable for harm to the person or property of a third person who may be expected to be in the vicinity of the chattel's probable use, if he has failed to use reasonable care to make the chattel safe for the use for which it is supplied. Cf. 2 Restatement of the Law of Torts (Negligence), § 388, p. 1039, § 394, p. 1073 and § 397, p. 1081. Although the MacPherson decision did not extend liability beyond the ultimate purchaser himself, later cases have extended it to the purchaser's employees (Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N.E. 571 (Ct. App. 1923)) and other users of the chattel (Hoenig v. Central Stamping Co., 273 N.Y. 485, *331 6 N.E.2d 415 (Ct. App. 1936); Lill v. Murphy Door Bed Co., 290 Ill. App. 328, 8 N.E.2d 714 (App. Ct. 1937)), to members of his family (White Sewing Machine Co. v. Feisel, 28 Ohio App. 152, 162 N.E. 633 (Ct. App. 1927)), and even to casual bystanders (Hopper v. Charles Cooper & Co., 104 N.J.L. 93 (E. & A. 1927); McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122 (Sup. Ct. 1927)).
Such liability for negligence, grounded in tort, is now the accepted legal view both in England (Donoghue v. Stevenson, [1932] A.C. 562) and in this country. The attention of some courts is shifting to the question of strict liability on the basis of some form of implied warranty where there is no contract. This latter approach is slowly gaining impetus; there is an increased feeling that social policy demands that the burden of incidental injuries caused by defective chattels be placed upon the producer since he is best able to distribute the risk to the general public by means of prices and insurance. Additionally, there is the difficulty of proving negligence in many cases where it exists, even with the aid of res ipsa loquitur. The authorities dealing with strict liability based on "warranty" are collected and discussed in Prosser, § 83, pp. 688-693.
Defendant could not reasonably have been required to do more than give specific instructions for the use of its product and a warning against allowing it to come in contact with the hands. See Dillard and Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va. L. Rev. 145 (1955); Tomao v. A.P. DeSanno & Son, Inc., 209 F.2d 544 (3 Cir., 1954); McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712 (Sup. Ct. App. 1953); Hopkins v. E.I. DuPont de Nemours & Co., 199 F.2d 930 (3 Cir., 1952); DeVito v. United Air Lines, Inc., 98 F. Supp. 88 (D.C., E.D.N.Y. 1951); Gall v. Union Ice Co., 108 Cal. App.2d 303, 239 P.2d 48 (D. Ct. App. 1951); Beadles v. Servel, Inc., 344 Ill. App. 133, 100 N.E.2d 405 (App. Ct. 1951); Ebers v. General Chemical Co., 310 Mich. 261, 17 N.W.2d 176 (Sup. Ct. 1945); Noone v. Perlberg, Inc., *332 268 App. Div. 149, 49 N.Y.S.2d 460 (App. Div. 1944); Bender v. William Cooper & Nephews, Inc., 323 Ill. App. 96, 55 N.E.2d 94 (App. Ct. 1944); Orr v. Shell Oil Co., 352 Mo. 288, 177 S.W.2d 608 (Sup. Ct. 1943); McClaren v. G.S. Robins & Co., 349 Mo. 653, 162 S.W.2d 856 (Sup. Ct. 1942); Altorfer Bros. Co. v. Green, 236 Ala. 427, 183 So. 415 (Sup. Ct. 1938); E.I. DuPont de Nemours & Co. v. Baridon, 73 F.2d 26 (8 Cir., 1934); 2 Restatement of the Law of Torts (Negligence), § 388, p. 1039. As to the adequacy of the warning given, see McClanahan v. California Spray-Chemical Corp., above; Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449 (Sup. Ct. 1945); Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N.E. 571 (Ct. App. 1923); Henry v. Crook, 202 App. Div. 19, 195 N.Y.S. 642 (App. Div. 1952). Defendant discharged its responsibility in this case by giving specific instructions for use and adequate warning.
It may be observed, in passing, that not only did plaintiff fail to read the instructions and warning printed on the Calgonite container, but used the product for a purpose not included among those recommended by defendant. The main use for Calgonite, and the one stressed by defendant on the printed box, was in mechanical dishwashers.
We find no authority for the proposition advanced by plaintiff that a manufacturer of detergents is required, in addition to giving proper directions as to use and a warning of possible injury, to state on the container both the chemical nature of the contents and the antidote or neutralizing agent to be used in case of injury. Plaintiff is in effect asking the court to exercise a prerogative which clearly belongs to the Legislature  a prerogative such as was exercised in the food and drug acts adopted on the federal level and in many states. We decline to do so on obvious grounds.
Affirmed.