78 N.J. Super. 375 (1963)
188 A.2d 622
JOSEPH PISANO, JR., AN INFANT, BY HIS GUARDIAN AD LITEM, JOSEPH PISANO, SR., AND JOSEPH PISANO, SR. AND ANN PISANO, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
S. KLEIN ON THE SQUARE, A CALIFORNIA CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 1962.
Decided February 27, 1963.
*377 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. Arthur C. Gundersdorf argued the cause for appellants (Mr. Walter S. Usher, attorney; Mr. Gundersdorf, of counsel).
Mr. Jerome S. Lieb argued the cause for respondent (Messrs. Harkavy and Lieb, attorneys; Mr. Lieb, of counsel; Mr. Ronald M. Sturtz, on the brief).
The opinion of the court was delivered by PRICE, S.J.A.D.
Pursuant to leave to appeal granted by this court (R.R. 2:2-3), plaintiffs seek the reversal of an order of the Superior Court, Law Division, setting aside jury *378 verdicts in favor of plaintiffs and granting "defendant's application for a new trial as to all issues." The verdicts, as returned by the jury, were in the sum of $30,000 in favor of Joseph Pisano, Jr., a minor, and in the amount of $3,000 for his parents, Joseph Pisano, Sr. and Ann Pisano, who sued per quod. The verdicts were based on injuries, suffered by the minor on March 25, 1959, while he was on an escalator descending from the second floor to the first floor in defendant's store. At the time of the accident the infant plaintiff, then five years of age, was accompanied by his father and by a younger brother Robert. It was conceded that they occupied the status of invitees.
Plaintiffs contended that as the father and the children were riding on the descending escalator, the father held each child by the hand, Robert occupying the escalator step in front of him and Joseph occupying the one immediately behind his father, the latter holding Joseph's right hand and Robert's left hand. Plaintiffs contended that the descending escalator, as it neared the first floor level, gave such "a violent jerk" as to cause Joseph's hand to slip from his father's grasp, the boy fell to the moving escalator steps, his left hand was "caught" in the space between the moving step and the stationary comb plate at the foot of the escalator and was severely mangled before the escalator could be stopped and his hand released. (The record does not disclose who turned the electric switch which caused the escalator to cease operation following the accident.)
The appeal focuses attention on the propriety of the trial court's aforesaid action, which defendant primarily seeks to sustain on the authority of Hartpence v. Grouleff, 15 N.J. 545 (1954). Plaintiffs in the instant case contend that the trial court's challenged order, setting aside both verdicts and directing that a new trial be had as to all issues (R.R. 4:61-1(a)), was so clearly without factual and legal support as to constitute an abuse of its "legal discretion" within the meaning of that phrase as stated in Kavanaugh v. Quigley, 63 N.J. Super. 153, 157-158 (App. Div. 1960). The basic *379 issue for resolution by us is whether the action of the trial court was such as to constitute "a denial of justice under the law" (Hartpence, 15 N.J., at p. 548).
In resolving this appeal we have considered and shall later comment on the content and pertinence of the opinions rendered in Kulbacki v. Sobchinsky, 38 N.J. 435 (1962), decided since the argument of the appeal in the case at bar.
To properly assess the merits of this appeal it is necessary to detail the proofs which were presented by the respective parties, as defendant contends that justification for the court's action in setting aside the verdicts and granting a new trial as to all issues is not limited to the reason assigned by the trial judge, to which hereinafter we specifically allude. Defendant not only asserts that errors were committed by the trial court in its charge to the jury warranting the reversal of the verdicts but urges that the proofs afford no justification for a finding that defendant was guilty of negligence proximately causing the injuries suffered by the minor plaintiff.
We turn to the record.
Plaintiff Joseph Pisano, Sr. testified that during the aforesaid descent from the second to the first floor of defendant's store the escalator's movement was "rickety"; that it "made different types of noises going down, a shaky, rickety ride." He described the escalator as "old" and contrasted it with other escalators, which he and the children had used immediately prior thereto in descending from the fourth floor of defendant's store, and which, he said, operated "more evenly" and "smoother." Amplifying his description of the accident, the father characterized the "violent jerk" as a "forward-backward movement." He stated that it occurred as they approached the "base of the steps" and was so severe as to make "me lose the balance of Joseph's hand, knocked him loose from me, and Joseph fell to the floor." His left hand "got caught between the plate and the steps." The father added that the boy's hand was caught up to "the knuckles"; that he tried to "hold the rest" of the boy's "hand back," but "the steps kept coming at him."
*380 Two women who were standing behind plaintiffs on the escalator witnessed the accident. One of them described the moving escalator as "rickety" and operating with "a juggling motion." She testified that just prior to the accident she observed Mr. Pisano and the two children standing on the escalator steps; that the father was holding each child by the hand; that she saw the boy Joseph "lose his balance" and fall; that he "put his hand down to get himself up" and "his hand just went into the bottom of the escalator." She stated that as "his hand was pulled in he was in a prone position." She testified that she was unable to state "at what moment [the boy] lost his balance," but that "he seemed to put his hand down quick, and in seconds his hand was in." A sister of the aforesaid witness, who was standing behind her on the descending escalator, testified that she, too, saw the child "lose his balance" and fall. She said that his hand "instantly was caught in the grooves." She stated that the escalator was "jerky" and that she "experienced a side to side motion, a jerking feeling."
Both of the aforesaid witnesses testified with reference to the extent of the space between the comb plate and the escalator step, the first stating that it was "possibly three-quarters of an inch wide." She described the space where the boy's hand had entered and was caught as "just about big enough for my hand to possibly go in, but a little boy's, it just ripped it right through." The second witness testified that at the place where the boy's hand "was caught in the grooves" there "were very wide spaces * * * which immediately caught" the boy's hand. His father, she said, tried to "extricate the hand, but it kept being caught because the escalator was in motion constantly."
Photographs of the escalator showing the physical location of the comb plate in its relationship to the escalator steps, were received in evidence.
A consulting engineer, Isaac Stewart (specializing in "accident and material failure evaluation" and who had made "a detailed study of escalator construction" and had examined *381 the escalator in question), testified as an expert witness on behalf of plaintiffs. Responding to a hypothetical question, which included a resume of the aforesaid testimony, Mr. Stewart testified on direct examination:
"It is my opinion that the escalator was not operating properly, to permit the jolt you mentioned, to permit the side sway and the rickety operation, and furthermore, to permit the hand to become lodged between the comb plate and the cleats of the steps.
Such conditions result from the flattening of the wheels that the steps ride upon; result from, in addition to that, the wearing of the rails  both of which are the main controlling element for the position of the steps in relation to the comb plate. The fact that the escalator moved sideways, as you indicated, indicates to me that there was excessive play in the locating of the wheels upon which the steps rode * * *. The rickety, uneven operation results from worn wheels on the step and the track. * * * The jerk condition that you mentioned develops due to extensive usage without complete maintenance, and in some instances results from electrical problems." (Emphasis supplied.)
The witness gave the following further testimony:
"Q. In an escalator that is properly maintained and kept in good operating condition, do you have a situation where there would be enough space between the last step and the comb plate for a child's hand to be caught? * * * A. No, sir, there would not be enough space."
He answered affirmatively an inquiry as to whether, if the space at the place in question were such that the "infant's finger got caught, that alone would tell you that the escalator was not operating properly." On further interrogation he emphasized that if a "child's finger gets caught" in the indicated area, it means that the escalator is "not running properly, because of excessive clearance between the comb plate parts and the step tread"; that such a happening would indicate that the escalator was not running "with the proper clearance."
Mr. Stewart further testified that at the time of the happening of the accident in question the "standard for the space between the edge of the comb plate and the bottom or the rim *382 or valley on the step as it passes underneath the comb plate" was "one-eighth of an inch."
The medical proofs showed that the injuries suffered by the Pisano boy in the aforesaid accident consisted of a "traumatic amputation of the left first and second fingers and a severely compound, comminuted fracture of the middle phalanx of the third finger," resulting in "a deformity" of that digit.
On behalf of defendant one John M. Smith, an elevator and escalator inspector of the City of Newark, testified that, accompanied by a maintenance employee of defendant, he had made his annual inspection of the escalators in defendant's store the day before the aforesaid accident. He described the inspection as "routine." He said that the escalator was then "running all right"; that it was "running smoothly." He testified that during the course of the inspection he rode on the escalator and looked it over. He examined the "comb plate" at the floor level, during the course of which examination defendant's mechanic, the witness said, "was showing me the comb plate, where he had put some rubber plugs, and I was asking him what's the plugs for, and he told me, `That's just an added protection we take.' * * * `I make the rubber plugs for that.'" The witness added: "They're not necessarily part of the escalator."
Harry Gebhardt, an electrician employed by defendant and its predecessor-operator of the store for over 20 years, testified that his job was to do the electrical work and minor repairs on the elevators and escalators in the store; that he oiled and greased "every escalator every week," and rode on them every day to determine whether "there's any jerk or anything." He added: "If it doesn't ride smooth or there's a bump, you can hear a bump * * * whether there's something wrong, whether its running unusual." He testified that he rode the escalator in question on the morning of March 25, 1959 and that it seemed "all right" to him. He acknowledged that at the time of the accident the escalator in question was "twenty-two years old." He added that two of the ten escalators in the store were ten years old.
*383 Timothy Hefferson, who was a maintenance employee of defendant and Gebhardt's assistant, checked the escalators on Mondays when Gebhardt had a day off and also, in connection with his general work, rode on the escalators on other days of the week. He testified that the escalator ran smoothly on March 23, the Monday preceding the date of the accident, and also that he did not notice any jolting, jerking or unevenness of operation before or after the accident.
James E. Whillis, a safety engineer, testified that because of the accident he inspected the exterior of the escalator "on behalf of the defendant" on March 26, the day following the accident. He said that he found "that it was operating in a normal and smooth manner." He made the inspection and the ensuing report of the results thereof jointly with another engineer (Mr. Langel) and because of its cumulative nature it was stipulated that Mr. Langel's testimony, if given, would be the same as that of Mr. Whillis.
William C. Holmes, who had been store manager of defendant for a few months preceding November 29, 1961, the commencement of the trial, and prior to that had been defendant's personnel director, testified that he rode the escalators several times each day and that between March 25, 1959 and April 13, 1959 (the date when an expert examined them on behalf of defendant) there were no "physical changes" made in the escalators. He specifically stated that on March 25 the escalator in question was "running smoothly."
Henry Clifford, a safety engineer, whose staff included the aforesaid witnesses Whillis and Langel, testified that he examined the escalator and measured various parts of it on April 13, 1959. He testified that he found that the escalator was "properly" maintained. He testified that violent jerking would immediately allow the tension frame or slack chain switch to operate and would stop the escalator. On cross-examination he conceded that if the action of the escalator was as described by plaintiff and his witnesses, the escalator "would be defective," and that his explanation of the aforesaid stoppage of the escalator in the event of "a violent jerk" *384 or "jump" was predicated on the assumption that the stoppage mechanism was in "good working order" on the day in question.
Under cross-examination Mr. Clifford testified that he was of the opinion that an escalator was "properly maintained" even though the space at the comb plate was such that a child's hand could "get caught" therein. He said "people shouldn't have their hand on an escalator tread." He amplified this viewpoint under examination by defendant's attorney as follows:
"Q. Explain why. A. For the simple reason a child's finger is compressible. The tread is moving against an immovable object and would be drawn in. If it had contact with the movable part, which would be the valley of the tread, which enters in underneath the finger or the tines of the comb plate, and it would be drawn in such a way that it couldn't be pulled out due to the fact that the friction of the tread of the escalator would constantly tend to pull the finger in and the child trying to pull the finger out.
Q. Mr. Clifford, whether it was a child's finger that could be depressed to the size of the 1/8 space or the 3/16 space that you mentioned. A. Yes.
Q. Or if I may be so bold as to say the tip end of a lady's heel that would be that small or the tip end of an umbrella or a pencil or a pit, it would still get caught in the space, wouldn't it, because of the fact that the size is there and it just would get in there? Isn't that so? A. That's right, sir.
Q. And that doesn't take away from the effectiveness of the operation of the escalator, does it? A. No, it doesn't."
One Diane Beacher, a customer of defendant, testified that she was in the store on March 25 and, after the accident happened, she heard one of the two sisters who testified for plaintiff as aforesaid (she was unable to state whether it was Mrs. Schwester or Mrs. Kavanagh) talking about the accident. The witness stated that she heard the speaker remark to another woman (also unidentified) that "she was standing behind the boy when the accident occurred, and that she heard his father say to him, `Take your hands off the step.'" (Both Mrs. Schwester and Mrs. Kavanagh had *385 previously denied, under cross-examination by defendant's attorney, that they had made any such remark to anyone.)
One Joyce Long, a customer of defendant, testified that on the afternoon of March 25, as she was riding on the "up" escalator from the first to the second floor of the store she saw the Pisano boy "sitting on the floor" of the escalator. On cross-examination she stated that as she was riding on the "up" escalator she did not see the boy "when he passed me"; that she "didn't see him going down the escalator" and that when she saw him he was "on the foot of the escalator; * * * at the bottom." She said she saw the boy's hand "get caught" and on redirect examination she answered affirmatively a question as to whether she saw "the boy sitting on the escalator before his hand got caught." (Mrs. Schwester had previously denied under cross-examination by defendant's attorney that the boy had sat on the step of the descending escalator, and Mrs. Kavanagh had specifically stated that the father and the boys were "almost to the foot of the escalator" when she saw "the boy lose his balance" and "put his hand behind him" and "instantly was caught on the grooves.")

I.
In assessing the propriety of the action of the trial judge, setting aside the aforesaid verdicts of $30,000 and $3,000 returned by the jury and granting a new trial as to all issues, our attention is primarily directed to the sole reason which he assigned therefor.
During the trial the attorneys for the respective parties stipulated that if the jury determined that the parents of the injured minor were entitled to a verdict, the amount thereof should be $928.25, the sum shown by the unchallenged proofs to have been expended by them for medical, surgical and hospital services rendered on behalf of the minor. The trial court charged the jury in conformity with that stipulation. The jury's verdict in favor of the *386 parents was initially stated to be $1,500 in favor of each parent. The trial court molded it into a joint verdict of $3,000 in favor of the adult plaintiffs.
Thereafter defendant moved (a) to set aside the verdicts and grant a new trial as to all issues, or, in the alternative, (b) for an order, pursuant to R.R. 4:51-2, for the entry of a judgment in favor of defendant "notwithstanding said verdicts."
The trial judge dealt initially with the alternative motion and, in denying it, stated that the case was one for jury resolution and that he found no merit in defendant's contention that its motion for a judgment of dismissal made at the end of the entire case should have been granted.
However, in voiding the entire verdict, the trial court assigned the following reason:
"Now, the only completely simple thing that anyone should understand  even the young child involved I think would understand it  it was stated more than once that all the parents sought was one lump sum and it was to cover two items; and I not only sent out the sheet, but I read it in explanation to the jury.
The sheet approved by both attorneys read: `On the claim of the plaintiffs Joseph Pisano, Sr., and Ann Pisano, individually, these plaintiffs have put in testimony that they paid or incurred the following bills as a result of injuries suffered by their son Joseph Pisano, Jr.: hospital bill $278.25, doctor's bill $650, total $928.25.'
I said in charging what they are entitled to recover, that they are only entitled to recover and they only seek to recover monies expended or incurred, stating again the two amounts.
I do not know of any stronger evidence that you can have of a jury either disregarding a very, very simple part of the charge, a part in which  I cannot understand how there could be any misunderstanding about it; and if a jury either failed to understand such a simple part of the charge or, on the other hand, if it understood it but disregarded it, I don't see how the verdicts can stand on liability or on damages.
Finding such an obvious either disregard of the Court's charge in a very simple matter or, if not disregard, failure to comprehend or understand, the certainly could not comprehend res ipsa loquitur or even the other charge on the negligence part, in my opinion; and if it was not failure to comprehend, it shows a disregard which certainly must be said to taint not only the verdict that is obviously opposite to the charge of the Court, but in my opinion there is nothing this Court can do, because the Court does not believe substantial justice *387 will be accomplished by supporting the findings of the jury on other phases."
In assessing the propriety of the trial court's aforesaid challenged order we note this court's limited scope of review as expressed in Kulbacki v. Sobchinsky, supra, 38 N.J., at p. 446, reaffirming the principle pronounced in Hartpence v. Grouleff, supra, 15 N.J., at pp. 548-549. See also Gallichio v. Gumina, 35 N.J. Super. 442, 447 (App. Div. 1955); Ruth v. Fenchel, 37 N.J. Super. 295, 304-305 (App. Div. 1955), affirmed 21 N.J. 171, 173, 60 A.L.R.2d 71 (1956); Dahle v. Goodheer, 38 N.J. Super. 210, 220-221 (App. Div. 1955), certification denied 20 N.J. 534 (1956).
It is of equal importance however to recognize that, if within the limitations of such review, it "clearly and unequivocally appears" that the action of the trial court constituted "a manifest denial of justice under the law," it is our duty to reverse that action. Hartpence, supra, 15 N.J., at p. 549. We observed in Dahle v. Goodheer, supra, 38 N.J. Super., at p. 221, that we consider the rule enunciated in Hager v. Weber, 7 N.J. 201, 210 (1951) as "still possessing viability and pertinence" and "we view Hartpence as supplementing the Hager rule and as lending emphasis to the considerations which must attend our review of the action of a trial judge * * *."
Although in some instances, where we are called upon to review the action of the trial judge in a situation comparable to the one here presented, his opinion throws "little light upon the basic and operative reasons which motivated him in granting a full new trial" (Dahle, supra, 38 N.J. Super., at p. 220), no such obscurity exists in the instant case. The trial judge assigned a single unequivocal reason for his action. We have quoted it above in its entirety.
There is no doubt that if the jury determined that the parents were entitled to a verdict against defendant, the amount thereof should have been $928.25. Plaintiffs, citing the nature and the "permanency of the injury suffered by *388 the infant plaintiff," seek to justify the $3,000 award because of the probability of some resultant loss of services, even though there was an "absence of proof as to the nature of the services lost" or the "extent" thereof, or "even in the absence of testimony that there probably would be some loss. They cite Simmel v. New Jersey Coop Co., 28 N.J. 1 (1958), and Mathias v. Luke, 37 N.J. Super. 241 (App. Div. 1955), but in neither of the cited cases was there a limiting stipulation such as existed in the case at bar. In fact, with the consent of both counsel, the trial court in the instant case submitted in written form to the jury the various possible verdicts which it might return, including one for the parents in the sum of $928.25. Furthermore, it charged the jury (without any challenge by plaintiffs' counsel) that a verdict, if rendered in favor of the parents, should be limited to that amount. Under such circumstances the fact that a claim for alleged loss of services was asserted in the complaint, or that such loss might be inferable from the nature of the injury, is of no moment. The stipulated limitation at trial, and the reliance of the court and counsel thereon, precluded any variance therefrom.
However, we are convinced that the trial judge erred in ascribing to the jury's verdict in favor of the parents the devastating and destructive implications he voiced.
Although the area in which this Division may exercise its appellate review is sharply circumscribed, Kulbacki, supra, 38 N.J., at p. 446, its supervisory power exists and is to be utilized in an appropriate case, Ibid, at pp. 451-2. The vitality of that power was specifically emphasized in the dissenting opinion in Kulbacki, at p. 462.
Initially assaying the trial court's challenged action solely on the basis of an examination of the single foundation on which, as aforesaid, it was rested by that court, we determine that it "clearly and unequivocally appears" that the sweeping order under scrutiny was wholly unjustified and "constituted a manifest denial of justice under the law." *389 Cf. Dahle v. Goodheer, supra, 38 N.J. Super., at p. 221; Randazzo v. Bacque, 37 N.J. Super. 548, 550 (App. Div. 1955), and Gallichio v. Gumina, supra, 35 N.J. Super., at p. 447. In rejecting as unsound the alleged effect of the single reason advanced by the trial court as the foundation for its complete reversal of the jury's action, we do not substitute our judgment for that of the trial court by an evaluation of "the evidence in a light that would justify the jury verdict," a procedure rejected in Hartpence v. Grouleff, supra, 15 N.J., at p. 549. No such evaluation of evidence is here involved. The trial court made no finding that the $30,000 verdict in favor of the minor was excessive. It made no adjudication that the proofs referable to defendant's liability would not support the verdict on that phase of the case. It simply labeled the $3,000 verdict as the product of defiance or ignorance because of its excessiveness and, having so reasoned, concluded that such defiance or ignorance must have dominated and controlled the jury's entire deliberation and its ultimate determination in all areas entrusted to it for resolution.
The aforesaid motion for a new trial was grounded in the contention that the verdicts were (1) "excessive," (2) "against the weight of evidence," and (3) "the result of mistake, passion, bias and prejudice." The trial court, seizing upon the excessiveness of the verdict in favor of the parents, and finding that such verdict in the sum of $3,000 was the result of the jury's "disregard" of or "failure to comprehend" the court's charge, held that such award automatically tainted the entire verdict. While specifically eschewing a finding that the jury was actuated by "sympathy" in the rendition of its verdict, the trial court noted that such an element was unavoidably present in a case of this type and expressed the belief that substantial justice would not be accomplished by "supporting the findings of the jury on other phases." We disagree. The jury's erroneous action was neither so clearly taken in willful disregard of the court's charge nor was it so evidently the product of stupidity *390 as to justify either characterization by the trial court. Equally unwarranted was the conclusion that it polluted the entire verdict.
Defendant relies on Kress v. City of Newark, 8 N.J. 562 (1952), and Purpura v. Public Service Elec. & Gas Co., 53 N.J. Super. 475 (App. Div. 1959), certification denied 29 N.J. 278 (1959), as supportive of its contention that the "jury's grossly unjust award to the plaintiff-parents" tainted the entire proceedings. Neither of the cited cases is pertinent to the circumstances revealed by the record in the instant case.
In Kress the Supreme Court not only found that a verdict of $90,000 in favor of plaintiff was "unquestionably excessive," but stated that the amount thereof "clearly and convincingly" indicated that it was the "result of passion or prejudice aroused by the mysterious and dreaded connotation that the term cancer implies to the average layman, which undoubtedly led to sheer speculation by the jury." 8 N.J., at p. 576. No comparable basic analysis entered into the conclusion of the trial court in the case sub judice.
In Purpura, supra, we held (53 N.J. Super., at p. 478), that in cases where a jury verdict is challenged as being "too high" the trial court is called upon to consider "whether the verdict is so excessive in amount as to show that the jury was so moved by passion or prejudice that its verdict as to liability must be equally tainted." In the case at bar no such situation is revealed. Defendant asserts in its brief that "an error in excess of $2,000 on an agreed amount of damages totaling $928.25 clearly shows that the jury `was moved by passion or prejudice' and therefore the verdict as to liability was equally tainted." It adds: "This was the direct holding of the trial judge herein." We perceive no such adjudication in the foregoing quoted pronouncement of the trial court. Moreover, we do not agree, as defendant also contends, that the trial court's "holding" was "equivalent to a finding that the verdict was either the result of passion or mistake." (Emphasis supplied)
*391 We next consider the first of the additional reasons advanced by defendant for affirmance of the trial court's action.

II.
Defendant asserts that although it made no objection to that portion of the court's charge concerning the relation of the issue of proximate cause to the facts of the case, an examination of the charge reveals its deficiency in that regard. Amplifying that contention, defendant states that it "had a right to expect a proper charge on so basic an issue" and that "failure to properly charge (although no objection was taken) was plain error which would have justified reversal of the judgment below, if defendant was the aggrieved party herein." Our analysis of the court's charge convinces us that defendant's criticism thereof is unwarranted. Defendant cites Kreis v. Owens, 38 N.J. Super. 148 (App. Div. 1955), and Barr v. Francks, 70 N.J. Super. 565 (App. Div. 1961), in support of its contention. They are clearly distinguishable from the instant case.
In Kreis the trial court's charge merely incorporated reference to proximate cause with no attempt at adequate definition thereof and without explaining the definition in relation to the facts. Moreover, in Kreis, potential liability involved more than one party, rendering a complete elucidation of the words of vital importance. Despite that fact, the court in Kreis ignored defense counsel's request to amplify its charge in that regard.
In Barr, also, multiple defendants were involved. We noted (70 N.J. Super., at p. 570) that the trial judge, after defining "negligence" and "proximate cause," failed to "instruct the jury that to find liability it must determine that the negligence of either or both defendants was the proximate cause of the collision." We specifically noted (at p. 570) that the "function of the doctrine of proximate cause as a limitation upon legal liability for effects traceable to the defendant was never touched upon, let alone explained *392 * * * even after defense counsel had protested the deficiency in the charge." In Barr (at p. 570), as well as in Kreis (38 N.J. Super., at p. 155), "the factual setting of the case made the problem of causation of great importance." In Kreis we stressed (at p. 155) not only must each case "be considered on its own facts" but, under the circumstances there present, when the attention of the court was called to the deficiency in the charge, it should have "proceeded to define and explain proximate cause." In the instant case we find that the trial court's instruction with reference to the proximate cause was adequate under the circumstances. It correctly defined "negligence" and "proximate cause"; emphasized that "the mere happening of the accident * * * without considering the question of fault" would not justify the rendition of "a verdict in favor of any plaintiff * * * against the defendant"; and, with reference to the sole defendant involved, stated in explicit terms that in order for plaintiffs to recover they had the burden of proving "by the greater weight of the evidence" that "defendant was negligent" and that its "negligence was a proximate cause of this accident." We observe that not only did defendant's counsel at trial register no objection to the foregoing phase of the court's charge but he made no mention of it whatever in his motion to set aside the verdicts. We find the contention, advanced for the first time before us in support of the trial court's action in setting aside the verdicts, to be devoid of merit.

III.
Defendant also seeks to support the trial court's order, setting aside the verdicts and directing a new trial as to all issues, on another ground not mentioned by the court in justification for its action. Defendant contends that the court's reference to the doctrine of res ipsa loquitur in its charge to the jury was erroneous since that doctrine, defendant asserts, had no application to the factual situation *393 existing in the case at bar. In support of its contention defendant advances several reasons to which we next direct our attention.

(A)
Defendant asserts in its brief that (1) the "application of the rule embodied in the maxim [res ipsa loquitur] * * * requires that the proofs show that there was no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect," and that element, defendant states, was "lacking in the case sub judice"; and (2) "the inherent nature of the escalator being what it is," a key requirement necessary for the invocation of the doctrine of res ipsa loquitur "i.e., the occurrence itself ordinarily bespeaks negligence," was "not met herein, at least insofar as that rule was applied to the total situation presented."
In support of its first above-mentioned point defendant states in its brief that its "proofs indicate the contrary situation, i.e., the infant plaintiff sitting on the steps of the escalator as it was moving down to the first floor." It then adds: "even though the child's negligence is not available as a defense because of his age, nevertheless, this fact should be available for the purpose of precluding reliance on the res ipsa [loquitur] doctrine." Apart from the fact that it is questionable whether the testimony in the record supports defendant's aforesaid version of the proofs, no authority for the proposition here advanced is cited by defendant. The trial judge specifically rejected such proposition. So do we.
With reference to the second point above urged, defendant initially takes the position that it is apparent from this court's decision in Overby v. Union Laundry Co., 28 N.J. Super. 100, 107-8 (App. Div. 1953), affirmed 14 N.J. 526 (1954), that plaintiffs in the instant case "should not be permitted to rely on the procedural device of res ipsa loquitur, since one of the basic elements is lacking." Defendant *394 argues that in Overby it was stated that the "hazards" of an escalator's "use have become generally known," indicating (states defendant) an acceptance of "the commonly known hazards inherent in escalators as the norm against which to compare other activities." From this, defendant categorically urges that it is clear that when an escalator accident happens, "the occurrence itself does not ordinarily bespeak negligence."
Defendant's premise affords no support for such conclusion. Certainly no such blanket statement with reference to the doctrine of res ipsa loquitur can be applied to escalator operation and to untoward or unusual occurrences in connection therewith. As was said in Lorenc v. Chemirad Corp., 37 N.J. 56, 70 (1962), "Res ipsa loquitur * * * is simply an emanation of the basic legal doctrine that a verdict in a negligence case may rest on circumstantial evidence." Its utilization results in presenting the issue for determination "in terms of permissible inferences of negligence from the facts proved." Ibid. Stressing that the application of the principle of res ipsa loquitur at the trial of cases "must be engaged in with regard for the nature of its impact on the facts," the court (at p. 71) added:
"Where the facts of a particular situation warrant its invocation, an inference of negligence may be drawn; it is not compelled. The facts are said to provide circumstantial evidence of negligence to be weighed, but not necessarily to be accepted as sufficient; they afford a basis for an inference of want of due care which the jury may, but need not, draw."
In passing, we note that in a supplemental brief defendant stated that "it is clear that the rule of res ipsa loquitur does not apply to escalator cases in New Jersey unless there is proof of a factual aberration from the normal operation of the escalator." (Emphasis supplied) In the instant case, however, plaintiffs presented proofs, as above set forth, from which the jury could have found that such "aberration" was present in the operation of the escalator in question. *395 The quality and significance of such evidence were for jury assessment.
Our examination of the court's charge to the jury in the case at bar shows that the court fully analyzed the issue of negligence and also made specific reference to the doctrine of res ipsa loquitur and correctly delineated the principles controlling its invocation, substantially as set forth in Lorenc v. Chemirad Corp., supra, at pp. 70-71. We have no doubt that the trial court was justified in holding that the principle inherent in the maxim was available to plaintiffs on the proofs which we have hereinbefore set forth in detail.
We further note that in the absence of "evidence" showing "the precise cause of the accident" (Cassady v. Old Colony St. Ry. Co., 184 Mass. 156, 68 N.E. 10, at p. 12, 63 L.R.A. 285 (Sup. Jud. Ct. 1903); Cleary v. Camden, 118 N.J.L. 215, 219 (Sup. Ct. 1937), affirmed 119 N.J.L. 387 (E. & A. 1937); Shaw v. Calgon, Inc., 35 N.J. Super. 319, 326 (App. Div. 1955)), "allegations of specific acts of negligence in pleadings or pretrial orders, or efforts to prove such acts at trial, do not preclude reliance upon res ipsa loquitur where the facts warrant its application." Lorenc, supra, at p. 62. In this connection the following statement in Reiter v. Max Marx Color & Chemical Co., 35 N.J. 37, 41 (1961) is equally pertinent in the case at bar:
"On these facts in our view an inference of want of due care in the maintenance of the ladder can be drawn by a jury whether the legal issue is dealt with in terms of inference of negligence or as one where the doctrine of res ipsa loquitur is applicable."
In concluding its foregoing contention, defendant states that "assuming arguendo" the aforesaid rule might properly be invoked by the trial court, error was committed by that tribunal in failing "to properly relate the res ipsa [loquitur] rule * * * to the evidence of the `violent jerk' as opposed to the bare fact of the accident and the infant plaintiff being enmeshed in the comb plate."
*396 A fair reading of the court's charge to the jury on the subject of res ipsa loquitur demonstrates that implicit therein is the fact that the judge was referring to the actual escalator operation and plaintiffs' aforesaid proofs of the unusual occurrence during the escalator's descent to the ground floor.

(B)
Defendant citing our decision in Dombrowska v. Kresge-Newark, Inc., 75 N.J. Super. 271 (App. Div. 1962), states in its brief that the cited case "is on all fours with that at bar and completely supports the action of the trial court below." Not so. Apart from our statement in Dombrowska that the doctrine of res ipsa loquitur had no applicability to the evidence there adduced (at pp. 274-275), to which statement we shall presently allude, the wide variance of the proofs in the respective cases demonstrates the inaccuracy of defendant's assertion that our decision in Dombrowska compels a decision in its favor on the instant appeal.
In Dombrowska no charge of negligence stemmed from the alleged existence of an unduly large space between the moving escalator steps and the comb plate at the floor level (as claimed in the instant case). In contrast with the case at bar, where detailed expert testimony presented on behalf of plaintiffs supported their charge that the unusual operation of the escalator bespoke its malfunction and also accounted for the aforesaid unduly enlarged opening at the comb plate site, no such proof of malfunction was presented in Dombrowska.
In the latter case we affirmed the trial court's entry of a judgment of dismissal following the court's reservation of decision on defendant's motion therefor pursuant to R.R. 4:51-2(a). The trial court found no evidence from which a legitimate inference of defendant's negligence could be drawn in favor of plaintiff. We agreed.
Moreover, although in Dombrowska there had been only oblique reference to the doctrine of res ipsa loquitur, we *397 considered that factor also in resolving the appeal. We concluded that the proofs contained no basis for invoking that doctrine because the escalator's operation therein described, on which operation plaintiff's claim was based, was not such as in "itself ordinarily bespeaks negligence." We emphasized that the only evidence descriptive of the happening of the accident was plaintiff's own testimony that as she was riding on a descending escalator she felt "a jerk and a vibration of some sort," to which she ascribed her fall. In affirming the trial court's entry of a judgment of dismissal we held that any operating escalator of necessity "involves motion" and that a "jerk" or "vibration" of such instrumentality while in operation, "absent some evidence that such jerk or vibration was unusual," was not "proof of malfunction." (At p. 274, emphasis supplied)
By way of additional contrast, in the case at bar plaintiffs' aforesaid proofs were that the violent jerk and unusual movement of the escalator on which the Pisanos were riding were of such severity as to cause the Pisano boy to "lose his balance," break from the grasp of his father's hand and fall to the level of the escalator step where his hand was drawn into the open space at the comb plate. That contrast between the evidence of the escalator's movement in Dombrowska, described simply as "a jerk and a vibration of some sort," and the escalator's violent jerk and unusual movements revealed by plaintiffs' proofs in the instant case, together with the testimony of plaintiffs' expert that such movements demonstrated malfunction, shows the fallacy of defendant's contention that the cases were factually the same.

IV.
Defendant next asserts the existence of further trial error, which, it contends, was sufficiently prejudicial to support the court's aforesaid action directing a new trial as to all issues. The situation to which defendant alludes stemmed from the fact that during the trial testimony on *398 behalf of plaintiffs and defendant was presented as to whether at the time of the happening of the accident the first floor of defendant's store was "crowded," particularly in the area of the first floor escalator; also whether the customers were sufficiently numerous in that area to require that a guard be in attendance at the escalator in question. Defendant's proofs described the store's policy that guards were assigned at the escalators when in the judgment of management the customers were present in sufficient numbers to warrant such precaution, a condition which defendant alleged did not exist at the time of the accident in question. At the close of the case defendant's counsel (out of the presence of the jury) moved that the aforesaid proofs be stricken as irrelevant to the issue of proximate cause. The court agreed with defendant's contention and ruled that the absence of guards would "not be a factor" in the case.
On the completion of the argument of the aforesaid motion and of a subsequent motion by defendant for dismissal of the case, the jury returned to the courtroom. The record before us contains no evidence that the court advised the jury of its aforesaid ruling, and its omission to do so was not called to its attention by counsel. The summations by counsel and the court's charge followed. On appeal the statement of plaintiffs' counsel to us that no reference to the aforesaid testimony was made by either attorney during the respective summations is not challenged by defendant's counsel. No requested charge with reference to the proofs in question was submitted; the court made no allusion whatever to the subject in its charge; and no issue referable thereto was presented to the jury for resolution. Defendant's notice of motion for a new trial contained no mention thereof, but during the argument of the motion defendant's counsel alluded to the subject. In granting the motion the court did not assign its aforesaid omission as an error justifying its action setting aside the verdicts. Moreover, on appeal defendant, in its initial brief and in a subsequent brief filed before oral argument, made no reference to the *399 matter whatever. During the course of the oral argument before us defendant's counsel sought to revive the point as an additional basis for sustaining the trial court's action in setting aside the verdicts. From our examination of the entire record we are persuaded that the court's omission was not prejudicial and did not affect the substantial rights of the parties, and that defendant's belated move to claim the existence of prejudicial error is unwarranted. R.R. 4:63-1.

V.
Defendant finally argues that plaintiffs failed to sustain their allegation of negligence by their failure to prove that it had notice of any alleged defect in the escalator operation. Whether the alleged defects in the escalator were of such a nature that defendant should have had constructive notice thereof was a factual question and was specifically submitted to the jury under an appropriate charge by the court.

VI.
The challenged order of the trial court is reversed. The verdict in favor of Joseph Pisano, Sr. and Ann Pisano, in view of the aforesaid stipulation, is to be reduced to $928.25 and entered in that sum. The verdict in favor of Joseph Pisano, Jr., an infant, by his guardian ad litem, Joseph Pisano, Sr., is reinstated in the sum of $30,000.
The case is remanded to the trial court for entry of judgments in accordance with this opinion.